KARIN M. COGBILL, Bar No. 244606
kcogbill@hopkinscarley.com
MICHAEL W. M. MANOUKIAN, Bar No. 308121
mmanoukian@hopkinscarley.com
HOPKINS & CARLEY
A Law Corporation
The Letitia Building
70 S First Street
San Jose, CA 95113-2406

THEODORE A. SCHROEDER, PA Bar No. 80559
*pro hac vice*
LITTLER MENDELSON, P.C.
625 Liberty Avenue
26th Floor
Pittsburgh, PA 15222
Telephone: 412.201.7600
Fax No.:    412.456.2377

RACHAEL LAVI, Bar No. 294443
LITTLER MENDELSON, P.C.
2049 Century Park East
5th Floor
Los Angeles, CA 90067.3107
Telephone: 310.553.0308
Facsimile:  310.553.5583

Attorneys for Defendant
PPG ARCHITECTURAL FINISHES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALLEN LAWSON,<br><br>Plaintiff,<br><br>v.<br><br>PPG ARCHITECTURAL FINISHES, INC.,<br><br>Defendant. | Case No. 8:18-CV-00705-JVS-JPR<br><br>**DEFENDANT PPG ARCHITECTURAL FINISHES, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>**Judge:** **Hon. James V. Selna**<br>**Hearing Date:** **November 7, 2022**<br>**Time:** **1:30 p.m.**<br>**Courtroom:** **10C** |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................... 1

II.  STATEMENT OF UNCONTROVERTED MATERIAL FACTS .................... 2

    A.   Plaintiff worked as an at-will territory manager for PPG .......................... 2

    B.   Although Plaintiff had some initial success, starting in October
         2016, Plaintiff failed to consistently meet his monthly sales quota
         and subsequently struggled with his market walks .................................. 3

         1.   Plaintiff scored "Marginal" on his December 2016 Market
              Walk and "unsuccessful" on his March 2017 Market Walk .......... 4

         2.   Plaintiff again scored "Unsuccessful" on his April 2017
              Market Walk ...................................................................... 6

    C.   On the same day Plaintiff's April Market Walk concluded, an
         anonymous report was submitted to PPG's third-party ethics portal ....... 6

    D.   The PIP was delivered to Plaintiff on May 12, 2017 ............................... 8

    E.   The Company received an anonymous complaint on June 15, 2017,
         which the Company immediately investigated ........................................ 9

    F.   PPG extended Plaintiff's PIP for an additional 30 days to allow
         him more time to meet the PIP ............................................................ 11

    G.   After another Unsuccessful Market Walk, Plaintiff was terminated ...... 12

III. PROCEDURAL HISTORY ...................................................... 14

IV.  LEGAL ARGUMENT ............................................................ 14

    A.   Standard for granting summary judgement ........................................... 14

    B.   Plaintiff's First Cause of Action for violation of Labor Code
         § 1102.5 fails for multiple reasons ...................................................... 15

         1.   Plaintiff cannot show by a preponderance of the evidence
              that any alleged protected activity was a contributing factor
              in PPG's decision to terminate his employment .......................... 16

         2.   Assuming arguendo that Plaintiff's alleged protected activity
              was a contributing factor, PPG has established that the
              termination would have occurred for legitimate, independent
              reasons ............................................................................. 19

# TABLE OF CONTENTS
(continued)

**Page**

C.     Plaintiff's Second Cause Of Action for wrongful termination in violation of public policy fails ................................................................ 23

D.     Plaintiff Is Not Entitled To Punitive Damages As A Matter Of Law ..... 24

V.   CONCLUSION ................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abernathy v. Duncan Enterprises*
  2022 WL 1789908 (June 2, 2022) .................................................................. 18, 19

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) .......................................................................................... 15

*Blincow v. MillerCoors, LLC,*
  2018 WL 3869162 (2018) ................................................................................ 24

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) .......................................................................................... 15

*Feretti v. Pfizer Inc.,*
  No. 11cv4486, 2013 WL 140088 (N.D. Cal. June 6, 2016) .............................. 17

*Gavriliuc v. TEKsystems, Inc.,*
  2022 WL 2965667 (C.D. Cal. 2022) ................................................................ 23

*Godwin v. Hunt Wesson, Inc.,*
  150 F.3d 1217 (9th Cir. 1998) .......................................................................... 24

*Guz v. Bechtel Nat'l, Inc.,*
  24 Cal.4th 317 (2000) ................................................................................. 19, 23

*Lawson v. PPG Architectural Finishes, Inc.,*
  12 Cal. 5th 703 (2022) ...................................................... 14, 16, 18, 19, 20, 23

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973) .......................................................................................... 23

*McLaughlin v. Nat'l Union Fire Ins. Co.,*
  23 Cal. App. 4th 1132 (1994) .......................................................................... 24

*Morgan v. Regents of University of California,*
  88 Cal.App.4th 52 (2000) ................................................................................ 23

# TABLE OF AUTHORITIES
(continued)

**Page**

*Mt. Healthy City Board of Ed. v. Doyle*
  429 U.S. 274 (1977)...............................................................................19

*Nosal– Tabor v. Sharp Chula Vista Med. Ctr.*,
  239 Cal.App.4th 1224 (2015)...............................................................23

*Noyes v. Kelly Services*,
  488 F.3d 1163 (9th Cir. 2007) .............................................................24

*Conservatorship of O.B.*
  9 Cal.5th 989 (2020)............................................................................20

*Vatalaro v. County of Sacramento*
  79 Cal.App.5th 367 (2022)....................................................20, 21, 22

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002)..............................................................24

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
  435 F.3d 989 (9th Cir. 2006) ...............................................................17

**Statutes**

Cal. Civil Code § 3294 ............................................................................24

Cal. Labor Code § 1102.5.......................................1, 2, 14, 15, 16, 18, 19, 23

Cal. Labor Code § 1102.5(a) ..................................................................16

Cal. Labor Code § 1102.5(b) ..................................................................16

Cal. Labor Code § 1102.5(c) ..................................................................16

Cal. Labor Code § 1102.6.......................................14, 16, 18, 19, 20, 23

**Other Authorities**

CACI 201 ..................................................................................................20

Fed. R. Civ. P. 56(c) ...............................................................................15

Fed. R. Civ. P. 56(e)(2).............................................................................15

# I.   INTRODUCTION

This Court previously granted PPG's motion for summary judgment in its entirety. Plaintiff appealed as to his claims for violation of Labor Code section 1102.5 and wrongful termination in violation of public policy. Although the California Supreme Court clarified the legal standard that applies to a Section 1102.5 retaliation case, the facts have not changed, and neither should the outcome of PPG's motion. Additionally, there has been no change to the legal standard for evaluating Plaintiff's claim for wrongful termination in violation of public policy, and thus the District Court properly applied the correct standard in previously granting PPG judgment on that claim.

Plaintiff Wallen Lawson was terminated from his employment for failing to perform the most essential duties of his job as a Territory Manager – developing and delivering sales plans to sell PPG products within Plaintiff's territory. After Plaintiff failed to attain his monthly sales quotas for eight of the prior twelve months, and struggled on consecutive market walks, he was placed on a Performance Improvement Plan ("PIP"). The goal of the PIP was to help Plaintiff improve his performance and help him meet the expectations and requirements of his job. At the conclusion of his initial 60-day PIP, the Company extended the PIP for an additional 30 days. Despite oversight from Human Resources and Plaintiff's Regional Sales Manager and Divisional Manager, Plaintiff was unable to meet the requirements of his position, and was terminated as a result.

Nearly a year after Plaintiff was terminated, he filed this lawsuit alleging he was terminated in retaliation for filing an *anonymous* complaint with PPG's independent ethics and compliance management provider. PPG does not deny that it received two anonymous reports (one in April 2017 and one in June 2017). Judgment for PPG, however, should once again be granted on Plaintiff's First and Second Causes of Action for retaliation and wrongful termination in violation of public policy because Plaintiff cannot prove that *anyone* at PPG knew that **Plaintiff** submitted any complaints –

anonymous, or otherwise – to PPG's independent ethics and compliance management provider. Indeed, the evidence is clear that it was not until this action was filed that PPG learned Plaintiff was the anonymous reporter. Moreover, Plaintiff's own manager was unaware that *any* such complaint had been made by anyone, let alone that Plaintiff was the reporting party.

Ultimately, Plaintiff cannot point to any *evidence* that his anonymous complaints were a contributing factor to his termination. Even if Plaintiff could overcome this insurmountable barrier to establishing a claim by a preponderance of the evidence, his Section 1102.5 claim still fails because PPG can show by clear and convincing evidence that Plaintiff was terminated for a legitimate and non-retaliatory reason, even if Plaintiff also allegedly engaged in protected activity.

Given Plaintiff still cannot show that his anonymous complaint played any role in the Company's decision to terminate his employment, summary judgment once again should be granted on Plaintiff's two remaining causes of action.

## II.   STATEMENT OF UNCONTROVERTED MATERIAL FACTS

### A.   Plaintiff worked as an at-will territory manager for PPG.

PPG manufactures and sells interior and exterior paints, stains, caulks, repair products, adhesives and sealants for homeowners and professionals. During Plaintiff's employment, PPG sold its products through its own retail stores, and through other retailers such as The Home Depot, Menards, and Lowe's. Plaintiff was hired in June 2015, as a Territory Manager ("TM"). (SAC, Dkt. 37 ("SAC"), ¶2.) In his role as a TM, Plaintiff managed PPG's sales at several Lowe's stores in and around Orange County, California. Plaintiff worked independently in the field and reported to a Regional Sales Manager ("RSM") who managed a team of TMs. At the start of his employment, Plaintiff reported to RSM Paul Stanton, and, after Paul Stanton was terminated from PPG for performance reasons, Plaintiff reported to RSM Clarence Moore ("Moore") who was based in Phoenix, Arizona. (Lawson Depo., 28:5-7; Mayhew Depo., 52:11-18.) Moore reported to Divisional Manager Sean Kacsir ("Kacsir"), who was based in

1   Kansas City, Kansas. (Kacsir Depo., 15:20-16:8.)

2        As a TM, Plaintiff was responsible for developing and delivering sales plans and

3   managing and increasing the sales of PPG products within his defined territory. (Moore

4   Depo., 130:6-20, Plaintiff's Exh. 36.[1]). Plaintiff describes his role as a TM as being "an

5   ambassador for the PPG company." (Lawson Depo., 19:23-20:15.) As a TM, Plaintiff

6   was paid an annual salary and subject to an annual sales incentive plan. (Plaintiff's Exh.

7   36.)

8        Some of Plaintiff's "Key Responsibilities" included: 1) partnering with Lowe's

9   management teams to develop, drive, and achieve sales growth plans; 2) working cross-

10  functionally with all appropriate Lowe's departments to exceed sales goals; 3) meeting

11  with all Lowe's store personnel weekly, and the District Manager once a month to

12  review sales performance against target; 4) analyzing territory sales performance

13  reports and developing strategic territory business plans to support growth; and 5)

14  aggressively identifying in-store selling opportunities. (*Id.*; Moore Depo., 130:6-20,

15  Plaintiff's Exh. 36.)

16       **B.    Although Plaintiff had some initial success, starting in October 2016,**
17       **Plaintiff failed to consistently meet his monthly sales quota and subsequently struggled with his market walks.**

18       One of the key metrics of success as a TM is the ability to meet monthly sales

19  goals. (Moore Decl., ¶ 4.) The sales goal is the total of the sales for that TM's specific

20  stores in the previous year. (*Id.*) The TM only needs to sell the same amount of product

21  as was sold in that same month the previous year to meet their goal. (*Id.*) PPG reviews

22  TMs' sales numbers on a quarterly basis. (Kacsir Depo., 110:10-21.) For the twelve-

23  month period of April 2016 to March 2017, Plaintiff only met his monthly goal four

24  times. (Lawson Depo., 148:17-149:3, Exh. 9.) Plaintiff missed his goal for six

25  consecutive months beginning in October 2016. (*Id.*)

26  / / /

27

28  ────────────────
    [1] Plaintiff's Exhibits are attached as Exhibit G to the Cogbill Declaration.

Since TMs work remotely in the field, the Company also uses Market Walks as a means for a RSM to coach, train and measure the performance of TMs against defined criteria. (Moore Decl., ¶ 6.) On Market Walks, RSMs and TMs visit several stores within a TM's territory and walk through the store to ensure TMs are building relationships with Lowe's employees, PPG product is properly placed throughout the store, and TMs are training and helping customers. (Lawson Depo., 21:24-22:14; 25:24-26:21.) Market Walks are scored in these categories: 1) Sales Results; 2) Sales Operations Checklist; 3) Sales Planning; 4) Relationships; 5) Merchandising; 6) Sales Tactics; 7) Pro Sales; 8) Administrative Duties; 9) Safety; and 10) Bonus Points. (Moore Decl., ¶¶ 7-8, Exh. A.) A TM's raw Market Walk score falls into one of five categories: 1) Exceptional; 2) Excels; 3) Successful; 4) Marginal; or 5) Unsuccessful. (*Id.*) Plaintiff testified both his RSMs, Stanton and Moore, conducted Market Walks in pretty much the same manner. (Lawson Depo., 26:22-28:17.)

In October 2016, Plaintiff conducted a Market Walk with RSM Stanton. (Moore Decl., ¶8, Ex. B.) On that particular Market Walk, Plaintiff excelled and received a score of 92. (*Id.*) However, Plaintiff struggled on three straight Market Walks thereafter in December 2016, March 2017, and April 2017. (Moore Decl., ¶¶ 9, 11, Exhs. B, C; Lawson Depo., 148:17-149:3, Ex. 9.)

### 1.   Plaintiff scored "Marginal" on his December 2016 Market Walk and "unsuccessful" on his March 2017 Market Walk.

After RSM Stanton was terminated, RSM Moore temporarily took over for the Southern California region, including Plaintiff's territory. (Lawson Depo., 31:1532:6.) Unlike Stanton, Moore provided Plaintiff with a pre-Market Walk checklist to help Plaintiff achieve successful results on his Market Walk. (Lawson Depo., 23:16-24:14.) Moore also spoke with Plaintiff before his scheduled Market Walks so Plaintiff could prepare to walk certain stores. (Lawson Depo., 24:15-22.)

In December 2016, Moore conducted a Market Walk with Plaintiff. (Moore Decl., ¶ 9.) This was the first Market Walk Moore conducted with Plaintiff, and together

they visited 3 stores. (*Id*.) Plaintiff scored a 60 – "Marginal", which was just one point above an "Unsuccessful" rating. (Moore Decl., ¶¶ 6, 9, Exh. B.) Some areas where Moore noted Plaintiff struggled included: 1) failing to have PPG product in specific locations; 2) failing to complete monthly goals and then representing on his checklist the goal had been completed; 3) failing to build relationships and communicate with key Lowe's employees; and 4) failing to update Plaintiff's Training Roster on each visit. (*Id*.) A Training Roster is a list of Lowe's associates that work at each of the stores within a TM's territory, and Training Rosters had to be updated by the TM after every visit to each store. (Moore Decl., ¶ 5.)

By early 2017, RSM Moore's territory officially changed to include Southern California, including Plaintiff's territory. (Moore Decl., ¶ 10.) In March 2017, Moore conducted another Market Walk with Plaintiff. (Moore Decl., ¶ 11, Ex. C.) They visited three stores in Plaintiff's territory. (*Id*.) Plaintiff scored a 58 – "Unsuccessful". (*Id*.) Plaintiff testified that following his March Market Walk, he received a verbal warning. (Lawson Depo., 71:3-8.) Following the Market Walk, Moore sent Plaintiff a detailed email identifying numerous shortcomings and areas for improvement. (Moore Depo., 146:4-11, Plaintiff's Exh. 38.)

Some issues Moore identified included: 1) Plaintiff failed to contemporaneously update his Training Roster, and failed to include some of Plaintiff's stores in his Training Roster altogether; 2) Plaintiff failed to establish relationships with key Lowe's staff members; 3) Plaintiff was unfamiliar with a key tool that provided TMs with critical product information; and 4) Plaintiff failed to stock PPG product in required locations. (*Id*.)

By mid-April 2017, PPG had received Plaintiff's 12-month sales numbers through March 2017. (Moore Decl., ¶ 12.) Because Plaintiff had missed 8 of the 12 months, the recommendation was to place Plaintiff on a PIP. (*Id*.) Andy Mayhew, Human Resources Manager, and Moore discussed the PIP, and concluded that one reason a PIP was appropriate was because Plaintiff had failed to achieve his sales goal

for <u>six straight months</u>.[2] (Mayhew Depo., 54:6-55:19; Moore Depo., 137:14-138:4, 139:10-140:6, Plaintiff's Exh. 37.) The decision to put Plaintiff on a PIP was ultimately made by Human Resources. (Kacsir Depo., 79:24-80:15; Moore Depo., 137:14-138:4, 139:10-140:6; 154:1-5, 223:4-9; Mayhew Depo., 40:23-41:5; Plaintiff's Exh. 37.)

### 2. Plaintiff again scored "Unsuccessful" on his April 2017 Market Walk.

On April 21, 2017, Plaintiff and RSM Moore completed another multi-day Market Walk. (Lawson Depo., 69:11-70:17.) This time, Plaintiff scored a 46 – "Unsuccessful". (*Id.*, 143:16-144:3, Exh. 9.) As with prior Market Walks, Plaintiff had failed to complete numerous national and regional monthly objectives, including 1) training Lowe's associates and completing his Training Roster; 2) completing PPG product demonstrations and displays; and 3) obtaining the contact information of specific Lowe's employees. (*Id.*) This was the second consecutive Market Walk that Plaintiff scored "Unsuccessful", and third consecutive Market Walk where Plaintiff had issues with his Training Roster. At the conclusion of the Market Walk on April 21, 2017, Moore discussed Plaintiff's performance issues with him. (Lawson Depo., 144:4-14.)

### C. On the same day Plaintiff's April Market Walk concluded, an anonymous report was submitted to PPG's third-party ethics portal.

PPG maintains an Ethics Helpline operated by a third-party administrator which provides PPG employees a secure way to anonymously report issues. (Duffy Decl., ¶ 4.) PPG also maintains a Global Code of Ethics which advises employees how to raise concerns through an online feature called the Compliance Portal, or through a toll-free phone number called the Ethics Helpline, both of which are operated by an independent third-party provider, Convercent. (Duffy Depo., Decl., ¶ 5.) Convercent receives and

---

[2] Any attempt by Plaintiff to blame his failure to meet his sales numbers on a territory realignment is futile because sales goals are set based on the performance <u>at that same store</u> *in the prior year.* (Moore Decl., ¶4.)

**DEFENDANT'S MPA IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1    documents any ethics reports. (Dalton Depo., 42:4-7, 99:22-24.)

2          On April 21, 2017, an anonymous report was submitted to Convercent's online

3    Compliance Portal. (Dalton Depo., 49:14-22, Plaintiff's Exh. 2; Lawson Depo.,

4    154:19-25.) The anonymous report stated that on April 18, 2017, an unidentified

5    "supervisor request[ed] territory managers purposely mis-mix product (paint) for the

6    purpose of getting rid a of a slow moving product off the shelves and selling it at a

7    reduced price."[3] (Plaintiff's Exh. 2.) The anonymous reporter was informed that,

8    "Neither Convercent Staff nor your organization will receive your contact information."

9    (*Id.*) The anonymous reporter specifically requested to remain completely anonymous.

10   (Lawson Depo., 149:21-150:5, Exh. 10.)

11         David Duffy, PPG's Senior Manager of Corporate Security and Investigations,

12   promptly sought to investigate the anonymous report. (Duffy Depo., 106:21-107:4.) The

13   anonymous report PPG received indicated the anonymous reporter was calling in

14   relation to a store in Long Beach, CA. (Lawson Depo, Exh. 10.) Using the Compliance

15   Portal, PPG informed the anonymous reporter that it had received and was reviewing

16   the anonymous report. (*Id.* at p. 3) On April 26, 2017, PPG followed up with the

17   anonymous reporter and requested more information regarding where the alleged

18   directive to mis-tint paint occurred since it had no store in Long Beach. (*Id.*) Despite

19   PPG's follow-up inquiry requesting additional information, the anonymous reporter

20   failed to provide any additional information, including their identity, and PPG closed

21   the investigation. (*Id.*, Duffy Depo., 58:6-13, 59:12-15).  Duffy was unaware that

22   Plaintiff was the anonymous reporter. (Duffy Depo., 57:19-23.)

23         During his deposition, Plaintiff testified he submitted this April 2017 complaint

24   anonymously because he did not want Moore, or anyone else at PPG to know he was

25   submitting a report. (SAC ¶¶ 8, 15; Lawson Depo., 154:19-155:13, 157:3-5.) Plaintiff

26

27   [3] Some of PPG's paint is sent to PPG's customers (e.g., Lowe's) in a neutral base color
     that is then tinted on-site to fulfill a specific order. A mis-tint occurs when the base paint

28   color is incorrectly tinted. (*See* SAC, ¶ 8.)

**DEFENDANT'S MPA IN SUPPORT OF
                                                    MOTION FOR SUMMARY JUDGMENT**

also testified this was the <u>first time</u> Moore directed Plaintiff to intentionally mis-tint paint. (Lawson Depo., 158:4-7.) Critically, Plaintiff testified he has no reason to believe Moore knew Plaintiff made this anonymous report. (*Id*., 170:37.) In fact, Plaintiff admits he ***told no one*** at PPG that he submitted this anonymous complaint. (*Id*., 169:25-170:2.) With respect to Moore, Plaintiff explicitly confirmed that he never told Moore that he submitted a complaint to PPG:

> Q. And did you tell Mr. Moore that you had actually submitted a complaint or reported him to PPG?
>
> A: No. No. No, I didn't.

(Lawson Depo., 157:3-5.)

### D.    The PIP was delivered to Plaintiff on May 12, 2017.

Consistent with their early discussions, Mayhew worked with Moore to draft Plaintiff's PIP. The PIP was delivered to Plaintiff on May 12, 2017. (Lawson Depo., 73:21-25, 143:16-144:3, Exh. 9.) Plaintiff's PIP identified numerous deficiencies in his performance, including: 1) missing his sales goal in 8 of the last 12 months; 2) making inaccuracies in a Training Roster he submitted on May 1, 2017; 3) repeatedly exceeding his allotted five hours of Admin Time per week without pre-approval from his RSM; 4) failing to complete monthly regional and national objectives; and 5) scoring two consecutive "Unsuccessful" Market Walks on March 15, 2017, and April 21, 2017. (Lawson Depo., 143:16-144:3, Exh. 9.) The PIP provided the expected measurable goals that Plaintiff was to accomplish, including: 1) meeting his sales goal for Q2, 2) maintaining an accurate training roster; 3) keeping Admin Time to 5 hours, absent prior approval; 4) timely completing regional and national initiatives; and 5) having a "Successful" Market Walk "prior to the end of the PIP to continue employment." (*Id*.) Plaintiff's PIP was set to expire on July 7, 2017.

The goal of Plaintiff's PIP was to help Plaintiff improve his performance and help him meet the expectations and requirements of his role as a TM. (Moore Depo., 156:22-157:2, Lawson Depo., 143:16-144:3, Exh. 9, Kacsir Depo., 80:22-81:10.)

**E.**   **The Company received an anonymous complaint on June 15, 2017, which the Company immediately investigated.**

On June 15, 2017, an anonymous complaint was submitted to PPG's Ethics Helpline.[4] (Lawson Depo., 162:18-163:12, 164:8-10; 164:24-165:22, Exhs. 12, 13.) The Helpline is managed by Convercent, who intakes the information and then passes along certain details/information to PPG. The June 15, 2017, anonymous complaint was submitted through Convercent's call center and the anonymous reporter stated a regional manager asked TMs to purposely mis-tint paint, and referenced a prior complaint submitted in April 2017. (*Id*.) The anonymous reporter indicated they wanted to remain anonymous to the organization, and that they had not reported the incident in question to any supervisors or management. (*Id*.)

It was not until the Complaint in this case was filed, that Plaintiff identified himself as the anonymous reporter. Plaintiff testified he understood that the person he submitted the complaint to was employed by a third-party, and was not a PPG employee. (Lawson Depo., 160:3-5, 162:10-17.) Likewise, Plaintiff confirmed he once again submitted his second complaint *anonymously*. (Lawson Depo., 160:16-18.) When PPG received the complaint, it did not receive the identity of the anonymous reporter (Duffy Decl., ¶ 8), and Plaintiff admitted he has no evidence to the contrary. (Lawson Depo., 162:1-4.)

Similar to the anonymous complaint submitted in April 2017, PPG commenced an investigation led by Duffy, who was assisted by John "Ian" Dalton, PPG's Forensic Audit and Loss Prevention Specialist. (Duffy Depo., 14:1-21, Dalton Depo., 10:19-22.) As part of the investigation, Duffy asked whether the anonymous reporter would speak with PPG regarding the information in the anonymous complaint. (Lawson Depo., 164:14-165:13, Exhs. 12, 13; Duffy Depo., 9:12-17.) The anonymous reporter agreed

---

[4] Curiously, Plaintiff's Second Amended Complaint, which was filed *after* Plaintiff's deposition, makes no mention of this June 2017 complaint, nor does he attribute it as a reason for his termination.

**DEFENDANT'S MPA IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

1 to speak with Duffy and provided PPG with a phone number. (Lawson Depo., 165:2-22;
2 Exh. 13.) PPG confirmed the conversation would be confidential. (*Id.,* 165:14-22; Exh.
3 13.)

4        The first time Duffy called the anonymous reporter, no one answered, and Duffy
5 left a voicemail.[5] (Lawson Depo., 165:23-166:2.) On or around June 29, 2017, Duffy
6 spoke with the anonymous reporter for about 15-20 minutes. (Lawson Depo.,
7 168:14-17.) During their call, Plaintiff does not remember ever identifying himself to
8 Duffy, and Duffy never referred to Plaintiff by name. (Lawson Depo., 168:18-23.)
9 When Duffy spoke to the anonymous reporter, Duffy guaranteed the reporter
10 confidentiality. (Duffy Depo., 16:8-15.) Duffy testified that to his knowledge, he did
11 not know he was speaking to Plaintiff. (Duffy Depo., 16:10-15, 18:20-19:4, 20:7-10,
12 24:24-25:5.)

13        After Duffy spoke with the anonymous reporter, he emailed Dalton and
14 Alejandro Sanchez Monjaraz, Global Forensic Audit Director, and stated:

15              The reporter was kind enough to provide a phone number on
               the posted message last night. I spoke to the reporter this
16              afternoon. **The reporter did not provide a name – since
               they were still concerned about remaining anonymous...**I
17              advised the caller to keep us informed if anything changed
               or if new information comes to light.
18

19 (Dalton Depo., 62:6-63:16, Plaintiff's Exh. 4 (emphasis added).)

20        On July 6, 2017, Dalton met with Moore to interview him regarding the June
21 2017 Complaint. (Moore Depo., 40:19-22; Dalton Depo., 50:24-51:7, Plaintiff's
22 Exh. 3.) Moore understood his conversation with Dalton was confidential. (Moore
23 Depo., 46:21-25, 94:3-5.) Dalton told Moore PPG's investigation was initiated to

24

25 [5] In opposition to PPG's prior motion, Plaintiff speculated that Duffy learned his
identify through Plaintiff's voicemail greeting, and then further speculated that Duffy
26 then shared Plaintiff's identity with either Dalton or Human Resources Director
Michelle Minda. Even if it reasonably could be assumed that Duffy learned Plaintiff's
27 identity in this manner, there is no evidence that he shared it with Dalton or Minda, both
of whom were unaware Plaintiff was the anonymous reporter until after this lawsuit was
28 filed. (Dalton Depo., 37:19-23, 63:25-64:5, 75:6-10; Minda Depo., 59:6-61:2.)

review expensed-out product, but never revealed to Moore that an anonymous complaint had been filed. (Dalton Depo., 38:16-39:6; Moore Depo., 40:9-18.) During their interview, Dalton told Moore to send a text message to his TMs that instructed them not to mis-tint paint anymore. (Dalton Depo., 55:17-21; Dalton Depo., 73:14-74:13, Plaintiff's Exh. 6; Moore Depo., 96:18-20.)

As part of the investigation, Dalton also interviewed all fourteen TMs that reported directly to Moore. (Dalton Depo., 50:24-51:7; Plaintiff's Exh. 3.) The TMs informed Dalton that Moore instructed them to mis-tint paint during multiple weekly conference calls. (Dalton Depo., 56:2-15.) Additionally, several TMs stated one TM, Laura Sanchez, openly opposed Moore's directive to mis-tint paint, and stated she would not carry out the practice. (Dalton Depo., 57:8-14.)[6] Dalton also interviewed Kacsir, to determine if Kacsir directed Moore to instruct TMs to intentionally mis-tint paint. (Dalton Depo., 58:11-59:8, 59:15-23.) Kacsir confirmed he gave no such instruction to Moore. (*Id.*) Similar to Moore, Kacsir did not know the extent of the investigation, or that it was initiated because PPG had received an anonymous complaint. (Kacsir Depo., 47:22-48:8, 50:25-51:10, 55:25-56:3, 63:9-17, 63:23-64:4, 71:14-21.) Moore did not know Dalton interviewed anyone else during the Company's investigation, including Kacsir or the fourteen TMs that reported to Moore. (Moore Depo., 47:9-15, 64:9-12, 79:14-80:3.)

Notably, similar to the first complaint Plaintiff alleges he made in April 2017, Plaintiff never told Moore or anyone else at PPG he submitted this June 2017 complaint. (Lawson Depo., 169:15-24.) Dalton did not learn Plaintiff was the anonymous reporter until after this lawsuit was filed. (Dalton Depo., 37:19-23, 63:25-64:5, 75:6-10.)

### F.   PPG extended Plaintiff's PIP for an additional 30 days to allow him more time to meet the PIP.

On or around June 29, 2017, Plaintiff spoke with Mayhew and said he felt Moore

---

[6] Sanchez remained employed as a TM until Lowe's cancelled its contract with PPG in March 2018. (Moore Decl., ¶ 17.)

was not properly overseeing his PIP. (Lawson Depo., 146:16-25, Mayhew Depo., 12:23-13:3, 49:12-16, 50:17-24.) Later that day, Mayhew emailed Kacsir and relayed Plaintiff's concerns regarding his two "Unsuccessful" Market Walks from March and April 2017, and Plaintiff's feelings that Moore was not overseeing his PIP closely enough. (Mayhew Depo., 99:7-14; Plaintiff Exh. 49.) Mayhew also told Kacsir he wanted to be included on all weekly PIP calls between Moore and Plaintiff. (*Id.;* Mayhew Depo., 15:3-10.)

Plaintiff did not meet his monthly sales goal for April, May and June 2017, scoring 95.4%, 94.4% and 86.1%, respectively. (Moore Depo., 223:21-224:20 Plaintiff's Exh. 46.) On July 13, 2017, Plaintiff completed another multi-day Market Walk with Moore. (Lawson Depo., 49:13-50:11, Exh 1.) On this Market Walk, Plaintiff scored a 66 – "Marginal" – which was higher than his previous three Market Walks with Moore, but did not meet the PIP expectation of "Successful." During the Market Walk, Moore told Plaintiff he would see if he could get Plaintiff's PIP extended for him. (Lawson Depo., 91:11-25.)

Although Plaintiff had not met the requirements of the PIP, Mayhew, Kacsir, and Moore decided to extend it for an additional 30 days because Plaintiff had shown some improvement. (Lawson Depo., 91:11-92:17, 146:16-147:3, Mayhew Depo., 58:24-59:10, 79:1-80:8.) Additionally, Moore supported extending the PIP because he recognized he had not been able to check-in with Plaintiff as frequently as Moore intended, and Moore did not take the decision to terminate Plaintiff lightly. (Moore Decl., ¶ 13.) After Plaintiff's PIP was extended, Mayhew estimates he spoke with Plaintiff every other week. (Mayhew Depo., 15:22-16:8.)

### G.   After another Unsuccessful Market Walk, Plaintiff was terminated.

To determine whether Plaintiff had successfully met his PIP, Kacsir asked Moore to conduct an additional Market Walk during Plaintiff's last week of his extended PIP. (Moore Depo., 202:6-204:1, Plaintiff's Exh. 43.) The Market Walk concluded on August 17, 2017, with Plaintiff scoring a 40 – "Unsuccessful" – his worst Market Score

during his entire employment. (Lawson Depo., 103:10-19, 137:10138:20, Exhs. 6, 7.) Both Moore and Kacsir attended this Market Walk. (Lawson Depo., 59:11-14.) Some issues identified on Plaintiff's August 2017 Market Walk were: 1) Plaintiff only visited his second highest volume store once in over five weeks; 2) Plaintiff achieved no national or regional objectives at three of his stores; 3) Plaintiff failed to train associates according to a monthly objective; 4) Plaintiff was not tracking sales of at least one PPG product; 5) Plaintiff failed to setup product displays; and 6) Plaintiff failed to update his Training Roster and his Training Roster had an inaccuracy in it. (Lawson Depo., 103:10-19, Exh 6; Moore Depo., 216:14-217:7.)

Notably, while on this Market Walk with Moore, Plaintiff also failed to adhere to PPG's safety guidelines, and Plaintiff later violated Company policy when he was using his cell phone while driving. (Lawson Depo., 115:2-7.) Kacsir reviewed Plaintiff's August 2017 Market Walk score and, based on what Kacsir witnessed during the Market Walk, Kacsir believed that Plaintiff's August 2017 Market Walk was fairly scored. (Kacsir Depo., 133:5-10.) Kacsir and Moore met with Plaintiff the following morning to discuss Plaintiff's Market Walk results with him. (Lawson Depo., 102:22-103:9.)

Following the Market Walk, Moore recommended that the Company proceed with terminating Plaintiff's employment. (Moore Decl., ¶14.) On September 6, 2017, Plaintiff met with Moore and Mayhew; Moore and Plaintiff met in-person and Mayhew attended the meeting via telephone. (Lawson Depo, 138:21-139:18; Exh. 8.) Mayhew informed Plaintiff he was being terminated for Plaintiff's inability to perform to PPG's standards set forth in Plaintiff's PIP, and for falsifying his training roster.[7] (Lawson

---

[7] Plaintiff admitted he did not do the training reflected in his roster, and acknowledged such action was falsifying company documents. (Mayhew Depo., 19:14-20:17.) Plaintiff also admitted inputting information incorrectly, and, sometimes, his training rosters were wrong. (Lawson Depo., 129:17-130:25.) Plaintiff admitted the roster and his store log-in reports may have had discrepancies such that the roster showed he trained Lowe's employees when he was not present at that store. (*Id.* at, 126:4-128:6.)

Depo., 138:21-139:18; Exh. 8; Mayhew Depo., 90:9-16; Moore Depo., 227:24-228:6.) Neither Duffy nor Dalton, the two individuals who lead the investigation into the June 2017 anonymous complaint, were involved in the decision to terminate Plaintiff. (Duffy Depo., 33:21-34:11; Dalton Depo., 64:9-16.) Moore, Kacsir and Mayhew first learned Plaintiff submitted a complaint to the ethics hotline after Plaintiff filed this lawsuit. (Moore Depo., 70:1-7; Kacsir Depo., 69:16-70:4; Mayhew Depo., 35:9-14.)

## III.   PROCEDURAL HISTORY

In his SAC, Plaintiff asserted six causes of action against PPG. On June 26, 2019, this Court granted PPG's motion for summary judgment in its entirety. Thereafter, Plaintiff appealed the Court's judgment on only two of his claims: (1) retaliation in violation of California Labor Code section 1102.5, and (2) wrongful termination in violation of public policy.

On appeal, the Ninth Circuit acknowledged that Courts were applying different standards when considering a Section 1102.5 claim on summary judgment. To resolve the issue, the Ninth Circuit certified the following question to the California Supreme Court: Does the evidentiary standard set forth in section 1102.6 of the California Labor Code replace the *McDonnell Douglas* test as the relevant evidentiary standard for retaliation claims brought pursuant to section 1102.5 of California's Labor Code? (Case 19-55802, Dkt. 56). The California Supreme Court confirmed that section 1102.6, and not the *McDonnell Douglas* test, was the relevant evidentiary standard for retaliation claims brought under Section 1102.6. *Lawson v. PPG Architectural Finishes, Inc.,* 12 Cal. 5th 703, 712 (2022) ("*Lawson*") The California Supreme Court did not change the applicable standard for a common law claim of wrongful termination in violation of public policy.  The Ninth Circuit then vacated the District Court's order and remanded for further proceedings consistent with *Lawson*.

## IV.   LEGAL ARGUMENT

### A.   Standard for granting summary judgement.

Summary judgment is appropriate where the record, read in the light most

favorable to the nonmoving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50.

The moving party has the initial burden of establishing the absence of a material fact for trial. *Anderson*, 477 U.S. at 256. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact ..., the court may ... consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). Furthermore, "Rule 56[(a)] mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Therefore, if the nonmovant does not make a sufficient showing to establish the elements of its claims, the Court must grant the motion. "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

**B.    Plaintiff's First Cause of Action for violation of Labor Code § 1102.5 fails for multiple reasons.**

According to his Second Amended Complaint, Plaintiff alleges he "complained to PPG's ethics hotline that he was instructed by his Regional Manager, Moore, to mistint paint in Lowe's stores." (SAC, Dkt. 37, ¶37.) Plaintiff summarily concludes he was retaliated against "for reporting his employer's unlawful conduct and practices to the employer's ethics hotline, and for opposing and refusing to participate in what he

1    reasonably believed to be unlawful conduct by his employer..." (SAC, Dkt. 37, ℙ38.)

2        California Labor Code section 1102.5(b), incorrectly cited by Plaintiff as

3    subsection (a) in the SAC, provides in relevant part that "an employer…shall not

4    retaliate against any employee for disclosing information…to a government or law

5    enforcement agency, to a person with authority over the employee or another employee

6    who has the authority to investigate, discover, or correct the violation or

7    noncompliance…if the employee has reasonable cause to believe that the information

8    discloses a violation of state or federal statute…" Section 1102.5(c) prohibits retaliation

9    "against an employee for refusing to participate in an activity that would result in a

10   violation of state or federal statute…"

11       The California Supreme Court has since clarified that, "[California Labor Code]

12   § 1102.6, and not *McDonnell Douglas*, supplies the applicable framework for litigating

13   and adjudicating section 1102.5 whistleblower claims." *Lawson*, 12 Cal. 5th at 712.

14   Section 1102.6 sets forth a two-part inquiry. *Id.* "First, it places the burden on the

15   plaintiff to establish, by a preponderance of the evidence, that retaliation for an

16   employee's protected activities was a contributing factor in a contested employment

17   action." *Id.* at 718. "Once the plaintiff has made the required showing, the burden shifts

18   to the employer to demonstrate, by clear and convincing evidence, that it would have

19   taken the action in question for legitimate, independent reasons even had the plaintiff

20   not engaged in protected activity." *Id.*

21       Here, Plaintiff cannot show by a preponderance of the evidence that his alleged

22   protected activity was a contributing factor in PPG's decision to terminate his

23   employment.

24              **1.    Plaintiff cannot show by a preponderance of the evidence that
25                      any alleged protected activity was a contributing factor in
                        PPG's decision to terminate his employment.**

26       Fatal to Plaintiff's prima facie case is the fact that there is no evidence the

27   decision makers – Moore, Mayhew and Kacsir – had *any* knowledge that Plaintiff

28

submitted two anonymous complaints until *after* Plaintiff filed his lawsuit.[8] (SUF 77.) This is consistent with Plaintiff's testimony that he did not disclose to Moore, or anyone else at PPG, that he submitted either of the two anonymous complaints. (SUF 35-37, 57, 59-61, 77.) Because the individuals involved in the decision to terminate Plaintiff's employment did not know Plaintiff submitted either anonymous complaint until *after* Plaintiff was terminated, Plaintiff cannot show that his alleged actions were a contributing factor in the Company's decision to terminate his employment. *See Feretti v. Pfizer Inc.*, No. 11cv4486, 2013 WL 140088, at *10 (N.D. Cal. June 6, 2016) ("Thus, Plaintiff may establish causation by showing that: (1) one of the decision makers responsible for each of the adverse employment actions taken against Plaintiff had knowledge that Plaintiff had engaged in protected activity, and (2) there is a close proximity in time between the protected activity and the adverse employment action.")

In Opposition to PPG's early motion, Plaintiff argued that Moore must have deduced that Plaintiff made the anonymous reports. This baseless contention is flawed because Plaintiff has no evidence that Moore knew of the April 2017 or June 2017 anonymous reports in the first place. (SUFs 34-37, 59). Although Dalton met with Moore about mistinting, Dalton told Moore that PPG's investigation was initiated to review expensed-out product, and Dalton *never* revealed to Moore that an anonymous complaint had been filed. (SUF 53). There is no evidence in the record to contradict this fact.

Although notably absent from his Second Amended Complaint, during deposition Plaintiff testified that he allegedly told Moore that he "wasn't comfortable purposely ruining paint." (Lawson Depo., 155:14-157:5). Even if the Court were to

---

[8] Although the outcome is the same, technically the Court need only conclude the undisputed evidence establishes the decision makers had no knowledge of the April 2017 complaint as that is the only alleged protected activity articulated in the SAC. (SAC, ¶¶8, 11-15.) *See Wasco Prods., Inc. v. Southwall Techs., Inc.,* 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.")

believe Lawson made such comments directly to Moore, despite his repeated testimony that he wanted to remain anonymous and never told Moore about his reports to PPG, the alleged statements to Moore occurred after the April 2017 Market Walk and after PPG made the decision to place Plaintiff on a PIP. (Lawson Depo., 156:13-15 (confirming the alleged conversation with Moore occurred "the next time I saw him, which I don't remember when it was."; Lawson Depo., 258:23-259:19 (confirming the conversation with Moore was in person); SUF 17-22.) Plaintiff's alleged statements to Moore also occurred *before* Plaintiff's July Market Walk, wherein he scored a 66 – "Marginal" – which was higher than his previous three Market Walks with Moore, and *before* his PIP was extended an additional 30 days. (SUFs 64-66.)  These positive actions, in relation to the negative actions that occurred prior to the alleged protected statement, completely belie any inference of a retaliatory bias by Moore (assuming that he was even aware of the alleged statement in the first place).

The Fifth District's decision in *Abernathy v. Duncan Enterprises* (June 2, 2022), 2022 WL 1789908, is instructive.[9] In *Abernathy*, the trial court originally granted judgment for defendant on plaintiff's Section 1102.5 claim following application of the *McDonnell Douglas* test.  On appeal, following *Lawson*, the Court applied Section 1102.6. As to the plaintiff's burden of proof, the Court noted that "[u]nder section 1102.6, Abernathy was required to come forward with evidence upon which a reasonable inference can be drawn to suggest that her protected action of reporting Waples was a contributing factor in her dismissal.  The evidence submitted permits no such inference." *Abernathy*, 2022 WL 1789908 at *9. The Court outlined the following as the distinction between the *McDonnell Douglas* framework and Section 1102.6 with respect to <u>plaintiff's</u> burden of proof:

> While one can proceed through the *McDonnell Douglas* framework by merely showing the bare facts of a report, an adverse action, and some circumstance suggesting

---

[9] PPG acknowledges this decision is unpublished. PPG is not citing this case as binding authority; only for illustrative purposes.

**DEFENDANT'S MPA IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1
2
3
4
5

> discrimination, the analysis under section 1102.6 requires, at a minimum, some valid inference that the protected action was a contributing – i.e., substantial or motivating – factor in the resulting harm. (Compare *Guz, supra*, 24 Cal.4th at p. 355 (*McDonnell Douglas* test) with *Lawson, supra*, 12 Cal.5th at pp. 714-715 (substantial or motivating factor requirement), citing *Mt. Healthy City Board of Ed. v. Doyle* (1977) 429 U.S. 274, 287.)

6   *Id*.

7   Taken in its totality, Plaintiff only has mere speculation that his anonymous
8   complaints and/or statement to Moore was a contributing factor in PPG's decision to
9   terminate his employment.  Plaintiff's speculation defies logic: Plaintiff intended to
10  remain anonymous (SUFs 29, 34-37, 43); Plaintiff never disclosed that he reported
11  Moore to anyone at PPG (SUFs 34, 36, 37, 43, 59); Moore was unaware any anonymous
12  complaints had been submitted (SUFs 37, 53, 59, 77); none of the decision makers was
13  aware that Plaintiff had made any anonymous complaints (SUF 77); Plaintiff's alleged
14  statement to Moore that he did not think mis-tinting was right occurred after Plaintiff
15  had missed his sales goal for 8 of the past 12 months (SUF 18, 82), after Plaintiff had
16  scored poorly on three consecutive market walks (SUF 11, 14, 23), after Human
17  Resources decided to put Plaintiff on a PIP (SUF 19, 21), and before Plaintiff received
18  his highest Market Walk score under Moore (SUF 64), and before Plaintiff's PIP was
19  extended for an additional 30 days (SUF 66).

20  As in *Abernathy*, there is no evidence to support a valid inference that Plaintiff's
21  anonymous complaints were even discussed or considered in any way by those who
22  made the decision to terminate Plaintiff's employment, let alone that they were a
23  contributing (*i.e.,* substantial or motivating) factor in the termination decision.
24  Therefore, PPG is entitled to summary judgment on Plaintiff's Section 1102.5 claim.

25
26
27

**2.    Assuming arguendo that Plaintiff's alleged protected activity was a contributing factor, PPG has established that the termination would have occurred for legitimate, independent reasons.**

28  Only after Plaintiff establishes by a preponderance of the evidence that the

alleged protected activity was a contributing factor in his termination, does the burden shift to PPG. Once shifted, PPG has the burden to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had Plaintiff not engaged in protected activity. *Lawson*, 12 Cal. 5th at 718. Clear and convincing evidence does not require absolute certainty; only that it is highly probably that the fact is true.  *See* CACI 201; *Vatalaro v. County of Sacramento* (2022) 79 Cal.App.5th 367, 386 (citing *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012 (discussing appellate review of findings made under the clear and convincing evidence standard.) In *Vatalaro*, the trial court initially granted summary judgment under the *McDonnell Douglas* framework.  On appeal, following *Lawson*, the Third Appellate District applied the framework set forth in Section 1102.6 and affirmed summary judgment in favor of the employer. The *Vatalaro* court concluded that the employer had presented sufficient undisputed evidence to satisfy its burden under Section 1102.6 (*i.e.,* that it would have terminated plaintiff's employment even if plaintiff had not engaged in protected activity), and that none of the plaintiff's arguments raised a triable issue of material fact.

The same outcome holds true here. Long before any alleged protected activity occurred, Plaintiff struggled with his performance. Beginning in October, 2016, Plaintiff missed his sales goal for six consecutive months. (SUF 18). Between November 2016 and April 2017, Plaintiff had three Market Walks, all of which indisputably occurred before Plaintiff participated in any protected activities. (SUF 11, 14, 23). On these three Market Walks, Plaintiff received an "unsuccessful" score twice and a "marginal score" once. (*Id.*) Thus, the evidence clearly established that Plaintiff consistently performed poorly on his Market Walks during the time he reported to Moore even before Plaintiff made an anonymous report to PPG regarding Moore's alleged misconduct. The fact that Plaintiff received one "excellent" score in October 2016 does not change this conclusion.

Additionally, as early as December 2016, Plaintiff's Market Walks demonstrate

Plaintiff consistently had issues with specific duties such as maintaining an up-to-date Training Roster, developing relationships with key employees at the Lowe's stores in Plaintiff's territory, and placing product in required areas throughout the Lowe's stores in Plaintiff's territory. (SUF 11-17, 23-25). Plaintiff's poor sales performance, coupled with his low Market Walk scores, warranted the Performance Improvement Plan (PIP). (SUF 18-21, 38-40.)  Quite tellingly, Plaintiff's SAC makes no mention of the fact he was on a PIP, and in turn, fails to allege any impropriety with the Company's decision to place him on a PIP.

Plaintiff had 60 days in which to meet the requirements of the PIP, a period that was extended for 30 days following the July 2017 Market Walk. (SUF 65-66.) Even with the additional time, Plaintiff failed to successfully complete the PIP. (SUF 63, 69.) To the contrary, Plaintiff's August 2017 Market Walk score was his lowest ever. (SUF 10-12, 14, 23, 69.) It can hardly be disputed that poor performance is a legitimate and independent reason for terminating an employee, which is consistent with Judge Guildford's prior Order holding PPG offered a legitimate, nondiscriminatory reason for firing Plaintiff.  (Dkt. 62 at pg. 7).

Although the burden no longer shifts back to Plaintiff to establish pretext, PPG has still carried its burden of showing that it would have terminated Plaintiff even if he had not engaged in any protected activity, and Plaintiff has not created a triable issue of material fact otherwise. *Vatalaro*, 79 Cal.App.5th at 386

First, according to several TMs, another TM, Laura Sanchez (not Plaintiff) openly opposed Moore's directive to mis-tint paint, and stated she would not carry out the practice.  Ms. Sanchez, however, remained employed with PPG as a TM until Lowe's cancelled its contract with PPG in March 2018. (Moore Decl., ¶ 17.) Reason and logic dictate that if an employee's alleged opposition to Moore's directive resulted in Moore having a retaliatory animus, then Ms. Sanchez surely would have suffered the same fate as Plaintiff.  The fact that she did not is compelling evidence that Plaintiff would have been discharged even if he had not engaged in protected activity.

Second, Plaintiff's SAC alleges that after he made the April 2017 complaint, "Moore proceeded to unfairly score [Plaintiff's] market walk evaluations in order to give him failing scores, starting with Lawson's July 13, 2017 market walk." (SAC, ⁋ 17.) According to Plaintiff, these "unfair" scores are what lead to his termination. (SAC, ¶ 18.) Plaintiff's deposition testimony, however, is in direct conflict. According to Plaintiff, *every* Market Walk on which Moore scored him – both *before and after* the April 2017 complaint –was unfair. (SUF 78.) Plaintiff also confirmed Moore did not make any comments to him or say anything to him that would give him any indication as to why Moore might be unfairly scoring Plaintiff's Market Walks. (SUF 79.) Critically, Plaintiff's July 2017 Market Walk score (66) was *higher* than each of his previous three Market Walks in December 2016 (60), March 2017 (58), and April 2017 (46). (SUF 11, 14, 23.)

Third, although Plaintiff adamantly denies he "falsified" his training roster, it is undisputed that Mayhew, a decision maker, honestly believed that Plaintiff had falsified his training records. (SUF 80.)  Additionally, Plaintiff's denial is nothing more than semantics. Indeed, Plaintiff admits he incorrectly inputted information, and, sometimes, his Training Rosters were wrong. (SUF 81.) Regardless of the terminology used, the outcome is the same – Plaintiff's Training Roster contained inaccuracies, and the issues with his Training Roster date as far back as his December 2016 Market Walk, which predates Plaintiff's first anonymous complaint by nearly four months, and Plaintiff's second anonymous complaint by almost six months. (SUF 12-13, 38-40, 71, 71, 80-81.)

Ultimately, PPG has carried its burden of showing that the undisputed evidence would require a reasonable fact finder to find it "highly probable" that PPG's decision to terminate Plaintiff would have occurred for legitimate, independent reasons even if Plaintiff had not complained about the directive to mis-tint paint. *Vatalaro*, 79 Cal.App.5th at 386.

/ / /

/ / /

**C.     Plaintiff's Second Cause Of Action for wrongful termination in violation of public policy fails.**

Under California law, "[t]he elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm." *Nosal–Tabor v. Sharp Chula Vista Med. Ctr.*, 239 Cal.App.4th 1224, 1234–35, (2015) (internal quotation marks and citation omitted).  A wrongful discharge in violation of public policy is a common law claim, and, therefore, the California Supreme Court's decision in *Lawson* does not change the analysis – or this Court's earlier determination that summary judgment should be granted on Plaintiff's Second Cause of Action.  *See Gavriliuc v. TEKsystems, Inc.,* 2022 WL 2965667 at *6, fn. 4 (C.D. Cal. 2022) (holding the *McDonnell Douglas* test is the relevant test for Courts to analyze a plaintiff's wrongful termination in violation of public policy claim).  Stated otherwise, while the burden of proof set forth in Section 1102.6 applies to Plaintiff's Section 1102.5 claim, the *McDonnell Douglas* framework continues to apply to Plaintiff's public policy claim.

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Plaintiff's claim fails for multiple reasons.  First, Plaintiff cannot establish a prima facie case since there is no evidence that the decision makers were away of either of the two anonymous complaints, and that he was the reporting party.  Second, even if a prima facie case is established, PPG had a legitimate, non-retaliatory reason for terminating Plaintiff's employment. (Dkt. 62 at pg. 7).

At that point, the burden then shifts back to the Plaintiff to prove that PPG's proffered reasons for termination are pretextual. *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 356 (2000). "[T]he plaintiff may establish pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Morgan v. Regents of University of California*, 88 Cal.App.4th 52, 68

1 (2000). (internal quotations omitted.) If the plaintiff relies solely on circumstantial
2 evidence, then he "must produce specific, substantial evidence of pretext." *Godwin v.*
3 *Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (internal quotations omitted).
4 "Where the evidence of pretext is circumstantial, rather than direct, the plaintiff must
5 present 'specific' and 'substantial' facts showing that there is a genuine issue for trial."
6 *Noyes v. Kelly Services*, 488 F.3d 1163, 1170 (9th Cir. 2007) (quoting Godwin, 150
7 F.3d at 1222). A plaintiff must show more than that the employer's justification is false
8 because "courts only require that an employer honestly believed its reason for action,
9 even if its reason is foolish or trivial or even baseless." *Villiarimo v. Aloha Island Air,*
10 *Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (internal citation and quotation marks
11 omitted).

12 Plaintiff can offer no evidence outside of his own speculation that PPG's reasons
13 for terminating his employment (*i.e.*, his failure to meet the requirements of the PIP and
14 falsifying his training roster) were pretext.  This was confirmed by Judge Guilford
15 previously, and should be reaffirmed by this Court.

16 **D.    Plaintiff Is Not Entitled To Punitive Damages As A Matter Of Law.**
17 "In California there is no separate cause of action for punitive damages."
18 *McLaughlin v. Nat'l Union Fire Ins. Co.*, 23 Cal. App. 4th 1132, 1164 (1994). To obtain
19 punitive damages, a plaintiff must first prove that there was a tortious act that gave rise
20 to actual, presumed, or nominal damages. *Id.* Further, a plaintiff must show malice,
21 oppression, or fraud. Cal. Civil Code § 3294; *see also*, *Blincow v. MillerCoors, LLC,*
22 2018 WL 3869162, at *5 (2018) (granting employer's motion for summary on
23 plaintiff's punitive damages claim because plaintiff failed to cite any authority to show
24 defendant's conduct met the "uniquely high standard" required by punitive damages).

25 Despite deposing seven PPG employees – Dalton, Duffy, Moore, Kacsir,
26 Mayhew, Minda, and Cathie McKinley – Plaintiff cannot identify any evidence, let
27 alone clear and convincing evidence, to support his claim for punitive damages.  Indeed,
28 by his own admission, Plaintiff has no reason to believe anyone at PPG was aware of

his anonymous complaints. (Lawson Depo., 169:25-170:2.) Additionally, Moore who allegedly retaliated against him, harbored no ill-will towards Plaintiff and in fact supported the decision to extend his PIP by an additional 30 days because he did not take the decision to terminate Plaintiff lightly. (SUF 65-67, 83.)

Accordingly, there is no triable issue of fact concerning punitive damages and summary judgment on Plaintiff's request for punitive damages should be granted.

## V.     CONCLUSION

For the reasons stated above, Judgment should be granted in PPG's favor on Plaintiff's First and Second Causes of Action, and in the alternative on Plaintiff's claim for punitive damages.


Dated:   August 31, 2022


                                    */s/ Karin M. Cogbill*
                                    KARIN M. COGBILL
                                    HOPKINS & CARLEY, ALC
                                    A Law Corporation
                                    Attorneys for Defendant
                                    PPG ARCHITECTURAL FINISHES, INC.



4892-8941-2654.9