**F I L E D**
CLERK, U.S. DISTRICT COURT

4/22/25

CENTRAL DISTRICT OF CALIFORNIA
BY: _____eva_____ DEPUTY

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Wallen Lawson, | ) | **8:18-cv-00705- JVS(JPRx)** |
| | ) | |
| | ) | |
| vs. | ) | COURT'S RULINGS ON |
| | ) | DEPOSITION DESIGNATIONS |
| | ) | |
| PPG Industries, Inc. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

1

1            UNITED STATES DISTRICT COURT

2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    Wallen Lawson,

5              Plaintiff,

6         vs.                    Civil Action No.

7                                8:18-cv-00705-AG-JPR

8    PPG Architectural Finishes,

9    Inc.,

10             Defendant.

11   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12                              no change

13                              JVS   4.22.25

14

15

16

17          DEPOSITION OF MICHAEL COOKSEY

18               Anaheim, California

19             Tuesday, March 12, 2019

20

21

22   Reported by:

23   NATALIE KHAMIS

24   CSR No. 14260

25   JOB No. 224588

Page 12

1       A.   No, to me, a market walk would be my district

2    manager's store visit or market director's store visit.

3    He'd come in with a team, and they would walk and asses

4    areas of the building, and then we would, you know,

5    discuss the findings of the day or things to work on or

6    whatever that would be, but it wouldn't have anything to

7    do with vendor rep or paint department or anything

8    specifically.

9       Q.   Okay.  Did anyone ever advise you that

10   Clarence Moore had directed his territory managers to

11   intentionally mistint any paint that was being sold in

12   the store?

**Foundation Calls for Speculation Relevance 403**

13              MR. BINDER:  Objection.  No foundation.

14              MS. LAVI:  And I'll join in that and calls for

15   speculation.

16   BY MR. FOX:

17       Q.   Did you ever hear of that?  Were you ever aware

18   of that?

19       A.   I'm not sure who Clarence Moore is, so I don't

20   know what it is you're referring to.  I don't think so.

21       Q.   Okay.  Let me ask you this:  Are you aware of

22   any instances where paint sold in your store -- in the

23   Huntington store was intentionally mistinted by anyone?

**Foundation Relevance 403**

24       A.   No.

25       Q.   Would that have been inappropriate?

**Foundation Relevance 403 Opinion**

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2       FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                   - - -

 4   WALLEN LAWSON,               )
                                  )
 5            Plaintiff,          )
                                  )
 6        vs.                     )        Case No.
                                  )   8:18-cv-00705-AG-JPR
 7   PPG ARCHITECTURAL            )
     FINISHES, INC.,              )
 8                                )
              Defendant.          )
 9
10                   - - -

11      Videotape Deposition of DAVID DUFFY

12         Thursday, February 21, 2019

13                   - - -

14        The videotape deposition of DAVID DUFFY,
     called as a witness by the Plaintiff, pursuant to
15   notice and the Federal Rules of Civil Procedure
     pertaining to the taking of depositions, taken
16   before me, the undersigned, Nina Warren Biehler, a
     Notary Public in and for the Commonwealth of
17   Pennsylvania, at the law offices of Obermayer
     Rebmann Maxwell & Hippel LLP, Suite 5240, One
18   Mellon Center, 500 Grant Street, Pittsburgh,
     Pennsylvania 15219, commencing at 10:10
19   o'clock a.m., the day and date above set forth.

20

21

22                   - - -

23           NETWORK DEPOSITION SERVICES
                1101 GULF TOWER
                707 GRANT STREET
24      PITTSBURGH, PENNSYLVANIA   15219
                (866)565-1929
25                   - - -
```

_(handwritten) ——— = reinstate testimony    JVS 4.22.25_

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

29

```
 1        assumes facts.
 2                  But you can answer.
 3                  THE WITNESS:  That was the
 4        speculation that I gathered from Mr. Dalton
 5        when he brought the information back.
 6   BY MR. FOX:
 7        Q     Okay.  Did you report results of your
 8   investigation to Lowe's?
 9        A     I am not aware if we did or not.
10        Q     You didn't do it -- you didn't report
11   to Lowe's personally?
12        A     No, sir.
13        Q     And you're not aware that anyone else
14   did --
15        A     Correct.
16        Q     -- right?
17              Why was Lowe's not informed of this
18   inventory fraud?
19                  MR. SCHROEDER:  Objection,
20        assumes facts, calls for speculation.
21   BY MR. FOX:
22        Q     So you don't know?
23        A     I do not know.
24        Q     Did you raise the question with anyone
25   at PPG, hey, maybe we should let -- let our
```

Relevance
Foundation
Assumes Facts

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

34

```
 1    been -- had been fired?
 2         A    I believe it was a conversation with
 3    counsel, Bill Adams.
 4         Q    When -- do you recall when that
 5    conversation occurred?
 6         A    I do not.
 7         Q    Would it have been shortly after Wally
 8    was fired?
 9         A    I have a funny feeling it was more
10    along the lines of when these interviews -- these
11    depositions were set up.
12         Q    Okay.  Do you think it's ironic that
13    the whistle blower who reported the misconduct of
14    Clarence Moore was terminated by Clarence Moore
15    and that --
16              MR. SCHROEDER:  Object -- sorry,
17         finish your question.
18    BY MR. FOX:
19         Q    -- Clarence Moore is still working at
20    the company?
21              MR. SCHROEDER:  Objection, calls
22         for an opinion.  Assumes facts.
23              You can answer.
24              THE WITNESS:  In my opinion, yes.
25
```

Relevance
403
Foundation
Opinion

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

## NETWORK DEPOSITION SERVICES
### Transcript of David Duffy

35

```
 1    BY MR. FOX:
 2        Q    Did you ever -- when you spoke with
 3    Wally Lawson -- let me ask you this, what was
 4    your -- did it seem like he was an honest guy,
 5    when you spoke with him?
 6                  MR. SCHROEDER:  Objection,
 7        foundation.
 8                  You can answer.
 9                  THE WITNESS:  The person I spoke
10        to on the phone during that time frame, yes,
11        I found him to be very honest, very credible.
12    BY MR. FOX:
13        Q    Did people that conducted -- were
14    involved in the investigation think that Clarence
15    Moore was honest and credible?
16                  MR. SCHROEDER:  Objection.
17                  THE WITNESS:  I do not know the
18        answer to that.
19    BY MR. FOX:
20        Q    Did anyone conducting the
21    investigation ever express to you any negative
22    views about Clarence Moore?
23        A    No, sir, not that I recall.
24        Q    Did they ever suggest to you that he
25    had a tendency to break the rules?
```

Foundation

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

36

Relevance
403

```
 1       A       No, sir, not that I'm aware of.

 2       Q       Did they ever discuss with you that

 3  his -- in his signature line for his e-mails he

 4  expressed a disrespect for -- for playing by the

 5  rules?

 6               MR. SCHROEDER:  Objection to

 7       the -- you can answer to the extent you're

 8       not disclosing attorney/client

 9       communications.

10               THE WITNESS:  Other than being

11       aware of that tag line on his e-mails, that's

12       all.

13  BY MR. FOX:

14       Q       Okay.  What was the tag line that you

15  were aware of?

16       A       I just -- something about compliance

17  not being as important as other things.

18       Q       Okay.  And how did you become aware of

19  that?

20       A       Through an e-mail discovery process.

21       Q       Okay, so that was something you

22  became aware of after -- after the litigation was

23  filed -- oh, no, I'm sorry, when you say e-mail

24  discovery process, you mean discovery during the

25  course of the investigation, right?
```

Relevance
403

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

37

```
1        A     That is correct.
2        Q     Okay.  Did someone bring that e-mail
3   to your attention?
4        A     I -- I found it.
5        Q     Returning to the conversation with
6   Wally Lawson, did he discuss whether or not
7   mistinting was happening in other regions of the
8   country, other than his region?
9        A     I believe Mr. Lawson indicated that it
10  was happening in specific states that were --
11  would have been in addition to his area, that's
12  correct.
13       Q     Okay.  Did he indicate those states?
14       A     If I'm not mistaken, it was Texas.
15       Q     Okay.  Did he identify any persons who
16  were knowledgeable about the mistinting that might
17  be occurring in Texas?
18       A     I don't recall a specific name, no.
19       Q     Did he tell you that many of the
20  territory managers were bragging about mistinting
21  the paint?
22       A     Yes, sir.
23       Q     Did that concern you?
24       A     Yes, sir.
25       Q     After you had the call with Wally
```

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

50

Relevance
403

| | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | Did you factor that into your analysis |
| 3 | in determining the potential amount of the fraud? |
| 4 | A | No, sir. |
| 5 | Q | Why not?  Why didn't you do that? |
| 6 | A | That wasn't my decision. |
| 7 | Q | Whose decision was it? |
| 8 | A | Counsel's. |
| 9 | Q | So, in fact, it could have been a lot |
| 10 | more than 300 products that were mistinted, |
| 11 | correct? |
| 12 | | MR. SCHROEDER:  Objection, calls |
| 13 | for speculation. |
| 14 | | THE WITNESS:  Correct. |
| 15 | BY MR. FOX: |
| 16 | Q | Now, in the Phoenix region the company |
| 17 | had 16 territory managers, correct? |
| 18 | A | I don't remember the exact number. |
| 19 | Q | Does that sound right to you? |
| 20 | A | It would be close, yes. |
| 21 | Q | And approximately 140 Lowe's stores, |
| 22 | locations; does that sound right? |
| 23 | A | Sounds right. |
| 24 | Q | Do you know how long the practice of |
| 25 | mistinting continued? |

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

69

Relevance
Foundation

```
 1      A     Yes, sir.
 2      Q     Okay, I'd like to show you Exhibit 13.
 3            Do you recall seeing this e-mail?
 4      A     I don't recall off the top of my head,
 5    no.
 6      Q     Were you aware that the territory
 7    manager in the Houston region had reported the --
 8    as reflected in the e-mail, the statement, "He
 9    told me that I can give the store credit for X
10    amount of gallons and then turn around and mistint
11    them or leave them on the shelf.
12            "I told him it sounded shady and I
13    wasn't going to do that.
14            "He then tells me it's fine to do that
15    as long as you don't do it all the time, because
16    Matt Thoman sees those RA reports and too much or
17    too many times can cause a red flag.
18            "Sorry, but that sounds a little
19    unethical to me."
20            So were you aware that a territory
21    manager had voiced this?
22      A     No, I'm not aware of it.
23      Q     And were you aware of Brian Wells'
24    response, as reflected in the e-mail?
25      A     No, sir.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

70

Relevance
Foundation

```
 1        Q      Would that have concerned you?
 2        A      Yes, sir.
 3        Q      Why is that?
 4        A      I think it's clearly stated that it
 5   sounds unethical.
 6        Q      Do you know what follow-up was done
 7   with Mr. Wells --
 8        A      I do not.
 9        Q      -- on this?
10               Okay, I'd like to show you Exhibit 14.
11               Okay, do you recall seeing this e-mail
12   exchange?
13        A      Yes.
14        Q      Okay, and this is an e-mail exchange
15   that contains the concerns noted by the Houston
16   territory manager, and reveals that it was Coree
17   Bell, correct?
18        A      Correct.
19        Q      And you -- you had -- in this exchange
20   you had indicated to Ian, in your -- in the middle
21   of the page, your response, "Ian, thanks for the
22   update.
23               "I'm on a c-call for the next 45
24   minutes.  I will track you down after that call.
25               "Thanks for providing this.
```

*Deer Tate*

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

87

```
 1                And if you had a conversation
 2      that was not with counsel you can discuss it;
 3      otherwise, you shouldn't answer the question.
 4                THE WITNESS:  It was all with
 5      counsel.
 6      BY MR. FOX:
 7          Q    Okay.  Was there anything more that
 8      you would have liked to have done had -- had you
 9      had the opportunity to do so, to determine the
10      extent of mistinting in the field, beyond
11      conducting this SurveyMonkey?
12          A    I don't have any -- that's up to the
13      operations team.
14          Q    Okay.  Would it not have been possible
15      to conduct some sort of audit or review, on a
16      random basis, at the store level, to more
17      thoroughly evaluate the extent of any mistinting
18      going on?
19          A    Could have been possible, yes.
20          Q    Do you know why that option was not
21      pursued?
22          A    I do not.
23                Excuse me, I'm sorry.
24          Q    So can we just go through the data
25      indicated on the first page?
```

Relevance Calls for Speculation

Reinstate

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

94

```
 1              MR. SCHROEDER:  Objection, calls
 2      for speculation.
 3              THE WITNESS:  I'm not aware of
 4      it.
 5      BY MR. FOX:
 6      Q      Okay.  Then the next item is,
 7  "Incorporate the policy into the on-boarding
 8  process as well during training meetings to
 9  reinforce the proper handling of PPG products."
10              What did you mean by that?
11      A      That any new hire that would come on
12  board would be given this documentation to
13  understand what the rules and regulations were
14  operating within these businesses.
15      Q      Okay.  That all incoming employees
16  would be instructed, thou shalt not mistint --
17      A      Yes, sir.
18      Q      -- if you will?
19      A      Yes, sir.
20      Q      Okay.  Do you know if that suggestion
21  you made was incorporated?
22      A      I do not know.
23      Q      The next item is, "Review with the
24  RSM, slash, DSM team the proper handling of PPG
25  product and to exercise care when providing
```

Relevance 407 (Subsequent Remedial Measures)

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

95

Relevance
407
(Subsequent
Remedial
Measures)

```
 1    direction to the TM population during market
 2    walks, slash, conference calls to always execute
 3    via the documented practice."
 4             What did you mean by that proposal?
 5        A    It was to make sure that in the -- in
 6    lines with communications, that people didn't
 7    misinterpret, misunderstand any communications
 8    that would have happened.  If it was not
 9    documented on how to do something they should not
10    have done it.
11        Q    Okay, was that proposal carried out?
12        A    I'm not aware of it.
13        Q    Was -- and you conclude by saying,
14    "Based on availability, I will attempt to schedule
15    a conference call to discuss any questions you may
16    have and review the suggested next steps."
17             Was such a conference call conducted?
18        A    Correct.
19        Q    And who participated?
20        A    If I'm not mistaken, it was corporate
21    counsel and Cathie McKinley, Max Wetzel and Dave
22    Cole.
23        Q    Okay.
24        A    I don't recall if Matt Thoman was
25    involved or not.
```

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

97

```
 1    out of the data.
 2         Q    Okay, so based upon what came out of
 3    the data, what was your estimate as to the amount
 4    of gallons of Rescue It product that were
 5    mistinted?
 6         A    I'd have to go back and look on the
 7    report.
 8         Q    Because it looks like, for example,
 9    here in -- Participant No. 78, on Page 3/9, says,
10    for that person alone, approximately 150 gallons
11    over the last two years would be a moderate guess.
12               MR. SCHROEDER:  What's the Bates
13         number of the page you're looking at?
14               MR. FOX:  780.
15               MR. SCHROEDER:  780?
16               MR. FOX:  Yes.  It says,
17         Participant 78.
18    BY MR. FOX:
19         Q    Do you see that?
20         A    Yes, sir.
21         Q    So that's just one participant in the
22    survey saying they -- they -- admitting to
23    mistinting 150 gallons, correct?
24               MR. SCHROEDER:  Object to the
25         form.
```

Relevance
Foundation

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

98

Relevance
Foundation
Calls for
Speculation

```
 1    BY MR. FOX:
 2        Q      Is that your interpretation?
 3        A      Correct.
 4        Q      So does that lead you to believe
 5    that -- and then if you go -- now, let's just turn
 6    to the next page.
 7             If you go to Participant 128, on the
 8    next page, they admit to tinting -- mistinting 100
 9    gallons.
10             And then if you go to Participant 144,
11    they admit to mistinting approximately 100 to 150
12    gallons.
13             Just with those three participants
14    alone, you've already well exceeded the 300
15    gallons you initially estimated, correct?
16        A      Correct.
17        Q      So did anyone make any further effort,
18    other than conducting the survey, to determine the
19    amount of paint that was actually mistinted?
20        A      Not that I'm aware of.
21        Q      Were -- do you know if PPG's outside
22    auditors were ever informed of the mistinting
23    fraud?
24        A      I don't know.
25                     MR. SCHROEDER:  Objection,
```

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

101

```
 1              THE WITNESS:  You'd have to talk
 2       to the technical team, I'm unaware.
 3  BY MR. FOX:
 4       Q     Okay.
 5             It also talks about -- some of these
 6  comments also talk about Assure Base 2.  Like, for
 7  example, on Page 788, the very top of the page,
 8  Respondent No. 25 states that, "Things like
 9  mistinting products, such as very old Icon or
10  discontinued Assure Base 2."
11             Do you know what that refers to?
12       A     No, sir.
13       Q     It looks like there are a lot of
14  things that are complained of in here that
15  weren't, necessarily, the subject of your
16  investigation, that related to unethical
17  misconduct in the field, correct?
18       A     Correct.
19       Q     What did you do to assure yourself
20  that that -- that that different type of unethical
21  misconduct wasn't related or not related to
22  Clarence Moore?
23             MR. SCHROEDER:  Objection,
24       assumes facts.
25             You can answer.
```

Relevance
Foundation

*Reardon*

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

102

Relevance
Foundation

```
 1              THE WITNESS:  We didn't take any
 2     action that I'm aware of.  I did not.
 3   BY MR. FOX:
 4       Q     Was Clarence Moore ever forced to
 5   revise his byline?
 6       A     I do not know.
 7       Q     Was there someone in the company who
 8   was protecting Clarence Moore, do you know?
 9       A     I do not know.
10       Q     Do you know if he had a champion or
11   supporter at higher levels of management?
12       A     I do not know.
13       Q     Was Sean Kacsir a supporter of
14   Clarence Moore, if you know?
15              MR. SCHROEDER:  Objection to
16     foundation.
17              THE WITNESS:  I do not know.
18   BY MR. FOX:
19       Q     Were you aware of any of the stated
20   reasons why Wally Lawson was terminated?
21       A     No, sir.
22       Q     Were you aware that -- let me ask you,
23   did you ever have any discussions with Andy --
24   Andy Mayhew about Wally Lawson?
25       A     No, sir.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of David Duffy**

105

```
 1   BY MR. FOX:
 2      Q     I just have one further question.
 3            Was any action taken by PPG as a
 4   result of the investigation that you oversaw?
 5                  MR. SCHROEDER:  Objection,
 6      foundation.
 7                  THE WITNESS:  I'm -- if it --
 8      from the Lowe's perspective, I do not know.
 9                  MR. FOX:  Okay, thank you, I have
10      no further questions.  Thank you, sir.
11                  MR. SCHROEDER:  I just have one
12      point of clarification.
13                      - - -
14                  EXAMINATION
15   BY MR. SCHROEDER:
16      Q     If you could look at what's been
17   marked as Exhibit 2, Plaintiff's Exhibit 2.
18            Mr. Duffy, is there anything in
19   Plaintiff's Exhibit 2 that indicated to you, at
20   the time you reviewed it, that this complaint
21   involved Lowe's stores?
22      A     No, sir.
23      Q     Okay.  So if you turn to the third
24   page, and you see -- there's the Messages section
25   there, including a message from you; is that
```

Relevance
Foundation

## NETWORK DEPOSITION SERVICES
## Transcript of Catherine McKinley

1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF CALIFORNIA
 2

 3   WALLEN LAWSON,                )
                                   )
 4            Plaintiff,           ) Case No.
       vs.                         ) 8:18-cv-00705-AG-JPR
 5                                 )
                                   )
 6   PPG ARCHITECTURAL             )
     FINISHES, INC.,               )
 7                                 )
              Defendant.           )
 8

 9                    - - - - -
              THE VIDEOTAPE OF CATHERINE McKINLEY
10                 WEDNESDAY, MAY 15, 2019
                      - - - - -
11

12        The videotape deposition of CATHERINE

13   McKINLEY, called by the Plaintiff for examination

14   pursuant to the Federal Rules of Civil Procedure,

15   taken before me, the undersigned, Aimee N. Szinte,

16   Notary Public within and for the State of Ohio,

17   taken at Cleveland Metropolitan Bar Association,

18   1375 East Ninth Street, Second Floor, Cleveland,

19   Ohio, commencing at 10:30 a.m., the day and date

20   above set forth.

21                      JVS   4.22.25

22
                            - neenstity
23
                             fest 1 snowy
24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Catherine McKinley**

18

Argumentative
Relevance

1    Q    Okay.  Well, you said you were not part of the

2         investigation process, but you were the head of

3         the group, the 6 or 700 persons within the

4         organization of which he was a member, correct?

5    A    Yes.

6    Q    Did you not think it was appropriate for

7         someone in the organization to confront

8         Clarence Moore, tell him directly, "Mr. Moore,

9         you shouldn't be doing this.  You shouldn't be

10        mistinting the paint and concealing it from the

11        Lowe's associates."

12    A    That was not my direct responsibility.

13    Q    Did anyone undertake that responsibility?

14              MR. SCHROEDER:  Objection.

15        Foundation.  You can answer.

16    A    I don't recall.

17    Q    You don't recall.  Okay.

18              Just redirecting your attention to

19        Plaintiff's Exhibit 3, I want to direct your

20        attention to the language beginning in the

21        second half of the first page.  "Moore was

22        instructed at that time to inform him team that

23        practice was to cease immediately."

24              Were you involved in instructing Moore to

25        cease the mistinting practice?

Foundation
Assumes Facts
Relevance

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

NETWORK DEPOSITION SERVICES
Transcript of Catherine McKinley

30

1    responsible as the account director for those

2    two businesses.

3  Q  Okay.  Did you make any effort to determine

4     whether or not the mistinting practice was

5     going on at any of those other retailers?

6  A  I did not.

7  Q  Did anyone?

8  A  I don't know.

9  Q  So, for all you know, there could have been

10     similar mistinting going on in a surreptitious

11     fashion at the Home Depot, Walmart and the

12     Menards stores?

13              MR. SCHROEDER:  Objection.  Calls

14     for speculation.  You can answer.

15  A  There could have been.

16  Q  Let me ask you this.  Who was your counterpart

17     at Lowe's?  Who would you regularly speak with

18     at Lowe's regarding PPG's relationship with

19     Lowe's?

20              MR. SCHROEDER:  Objection.

21     Assumes facts.  You can answer.

22  Q  Well, let me ask you.  Did you speak with

23     anyone regularly at Lowe's?

24  A  I never spoke to anyone at Lowe's.

25  Q  Okay.  Did you have a liaison role with them?

Relevance
Calls for Speculation

NETWORK DEPOSITION SERVICES
Transcript of Catherine McKinley

58

```
 1        higher up in the organization might be exposed?
 2     A  No.
 3     Q  Were you aware that after the ethics complaint
 4        was made, that Clarence Moore was permitted to
 5        retain supervision over Wally Lawson?
 6     A  No.
 7     Q  And were you aware that Clarence Moore was
 8        permitted to put Wally Lawson on a
 9        Performance Improvement Plan?
10     A  No.
11     Q  Were you aware that Clarence Moore was
12        permitted to engage in market walks with
13        Wally Lawson in which he was extremely critical
14        of Wally Lawson?
15     A  No.
16     Q  Were you aware that Clarence Moore recommended
17        that Wally Lawson be fired?
18     A  No.
19     Q  Were you aware that as a result of Clarence
20        Moore's conduct, Wally Lawson was fired?
21               MR. SCHROEDER:  Objection.
22        Vague.  You can answer.
23     A  No.
24     Q  And are you aware that Clarence Moore is still
25        with the organization?
```

Relevance
Foundation
Lay Opinion

NETWORK DEPOSITION SERVICES
Transcript of Catherine McKinley

59

Relevance
Foundation
Lay Opinion

```
 1    A    No.
 2    Q    Do you have an opinion as to whether or not
 3         that's fair?
 4              MR. SCHROEDER:  Objection.
 5         Assumes facts and calls for speculation.
 6    A    No.
 7    Q    I'm sorry.  So you have no opinion on that?
 8              MR. SCHROEDER:  You can answer.
 9    A    No.
10    Q    Was there any further conversation you had
11         with Clarence Moore after you issued him the
12         letter dated February 22, 2018?
13    A    No.
14    Q    Did you ever review the ethics complaint?
15    A    I saw something yesterday, but I don't know if
16         it was the ethics complaint.
17    Q    Prior to yesterday?
18    A    No.
19    Q    Did you ever have any conversation with
20         Andy Mayhew about Wally Lawson?
21    A    No.
22    Q    Did you ever have any discussion with
23         Andy Mayhew about Clarence Moore?
24    A    I don't think so.  I don't recall, but I don't
25         think so.
```

Relevance
Foundation
Lay Opinion

Relevance
Foundation
Lay Opinion

1          IN THE UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4

5   WALLEN LAWSON,

6                    Plaintiff,

7

8        vs.              Case No. 8:18-cv-00705-AG-JPR

9

10  PPG ARCHITECTURAL FINISHES, INC.,         *JVS  4.22.25*

11                    Defendant.

12                                        *reinstated testimony*

13

14              VIDEOTAPED DEPOSITION

15                       OF

16                  SEAN KACSIR,

17

18

19

20  taken on behalf of the Plaintiff, pursuant to Notice

21  to Take Deposition, beginning at 9:10 a.m. on the

22  28th day of March, 2019, at 1501 Westport Road,

23  Suite 100, in the City of Kansas City, County of

24  Jackson, and State of Missouri, before Ksenija M.

25  Zeltkalns, RPR, Kansas CCR No. 1461.

```
 1    team can't do that but we can help make a label.
 2    Most of the times the sales associates may not have
 3    known how to make a label.
 4        Q.   Okay.
 5        A.   So we had access to labels.
 6        Q.   Okay.  Let me ask you this.  Different
 7    question.
 8        A.   Um-hm.
 9        Q.   Clarence Moore has a tag line to his
10    e-mail reading:  Being committed is so much more
11    rewarding than being compliant.
12             Do you see that?
13        A.   I do.
14        Q.   Were you aware of that?
15        A.   I saw it.  I never really read it.
16        Q.   Well, it was in all his e-mails to you and
17    everyone else, was it not?
18        A.   Yeah.  It was just garbage on the bottom
19    of his e-mail.  I mean, I never read his e-mails on
20    that part of it, I mean.
21        Q.   Well, it's right there in plain view in
22    quotation marks right before his signature line, is
23    it not?
24        A.   Yes.
25        Q.   So you're telling me you never noticed it
```

Relevance
403
Argumentative

Page 89

1  before?

2      A.  I never really read it, no.  All of my

3  regionals have some weird tag line on the bottom of

4  their e-mail.

5      Q.  Would this tag line, though, in particular

6  not give you some pause, some concern?

7      A.  I mean, I never really looked at it or

8  cared about it.

9      Q.  Well, he seems to be poo-pooing the idea

10  of being compliant rather brazenly, does he not?

11          MS. COGBILL:  Objection.  Misstates and

12  argumentative.

13      A.  I believe that if you asked several people

14  their opinion on this e-mail they would come up

15  with different answers.

16  BY MR. FOX:

17      Q.  Well, how do you interpret it?  What do

18  you think it means?

19      A.  I just, in my opinion he wants his team to

20  be committed to what they're doing.

21      Q.  And he's suggesting that it's much more

22  important to be committed than to be compliant?

23      A.  I read it as doing both.

24      Q.  Is that not correct?

25      A.  Sorry.  I interrupted.

Page 90

```
 1              MS. COGBILL:  It's okay.  I was just going
 2    to put an objection on the record that it's
 3    argumentative, but.
 4         BY MR. FOX:
 5         Q.  Well, I'm just trying to figure out how
 6    someone can interpret this in any reasonable
 7    fashion other than as it appears to read, that
 8    Clarence Moore seems to be saying that being
 9    committed is of much greater value than being
10    compliant?
11              MS. COGBILL:  Objection.  Again,
12    argumentative.
13         BY MR. FOX:
14         Q.  Isn't that what it says?
15         A.  No.  That's your opinion.  I read it as
16    he's committed and compliant but that's just my
17    opinion of the statement.  It could be looked at
18    from anybody, but.
19         Q.  It doesn't say that.  It says being
20    committed is so much more rewarding than being
21    compliant.  It doesn't say being committed and
22    being compliant are both rewarding, does it?
23              MS. COGBILL:  Objection.  Argumentative.
24    The document speaks for itself.
25         BY MR. FOX:
```

Page 121

```
1      BY MR. FOX:
2      Q.   If it happened he'd be subject to
3  termination?  That's what I'm asking you.
4          MS. COGBILL:  Same objections.
5      A.   Hypothetically if it happened there would
6  have to be an investigation.
7      BY MR. FOX:
8      Q.   Okay.  And there was an investigation was
9  there not?
10     A.   I don't know.  I mean there's -- we had --
11 I don't know.  I wasn't privy to that information.
12     Q.   Okay.  And if as a result of that
13 investigation all of his direct reports all said,
14 to a man or woman, yeah, he told us to mistint the
15 paint and he told us to do it over a three-month
16 period, and assuming those people were being
17 truthful, would that not likely result in Clarence
18 Moore's termination?
19         MS. COGBILL:  Objection.  Assumes facts.
20 Calls for speculation.
21     A.   I don't know.  I've never had a situation
22 where it happened before, so again, I would --
23 hypothetically if it happened, I assume that the
24 people that made the investigation would
25 communicate to me what to do in that situation.
```

Incomplete (No Answer)
Assumes Facts

Page 122

```
 1        BY MR. FOX:
 2        Q.  Do you know why they didn't -- why no
 3    action was taken against --
 4             THE REPORTER:  I didn't -- repeat.
 5        BY MR. FOX:
 6        Q.  Do you know why no action was taken
 7    against Clarence Moore --
 8             MS. COGBILL:  Objection.
 9        BY MR. FOX:
10        Q.  -- from engaging in this activity?
11             MS. COGBILL:  Sorry.  Objection.  Assumes
12    facts.
13        A.  I wasn't a part of the investigation.
14        BY MR. FOX:
15        Q.  And do you think it's true also that if it
16    were determined that you had knowledge as Clarence
17    Moore's supervisor that he was directing his
18    territory managers to mistint the paint
19    intentionally, and secretively, that you could also
20    be subject to termination by PPG?
21             MS. COGBILL:  Objection.  Misstates facts.
22        A.  It didn't happen, so I mean.
23        BY MR. FOX:
24        Q.  Would you understand that would be the
25    consequence though, if such a thing had happened?
```

Assumes Facts
Incomplete (No
Answer)

Assumes Facts
Foundation

Assumes Facts
Foundation

Page 123

1    A.   I never thought about it until you brought

2    it up.  I wouldn't do that so I mean, you're asking

3    me a question on something I don't know how to

4    answer.  I don't know, I --I guess I don't know

5    what your question is.  You're saying that if I

6    knew about it and secretly did that.

Assumes Facts
Foundation

7    Q.   If you were aware that Clarence Moore was

8    doing it and didn't do anything to stop it, do you

9    think you'd be subject to being fired by the

10   company?

11   A.   I don't know.  That's not my decision.

12   Q.   And it's your testimony today that you had

13   no knowledge of intentional mistinting at the

14   direction of Clarence Moore?

15   A.   Correct.

16   Q.   All right.  I just want to know you, ask

17   you if you've seen it before, Exhibit 48.  I take

18   it you've never seen this document before?

19   A.   This document, correct.

20   Q.   Okay.  Did you ever see any documents that

21   you thought constituted Wally Lawson's training

22   roster?

23   A.   I don't know if I actually saw -- I don't

24   know if I ever looked at Wally's training roster,

25   but I did get training rosters in on a monthly

Page 125

1       Q.   Okay.   I'd like to show you Exhibit 35.

2   Were you advised of Wally's termination interview,

3   if you want to call it that, or termination

4   session.   Let's call it that.

5       A.   I knew that it was taking place.

6       Q.   Did you hear about what transpired there?

7       A.   I did not.

8       Q.   Did Clarence call you after the interview

9   or after the firing?

10      A.   I don't recall.

11      Q.   Do you know if during the course of the

12  firing session Wally said to Clarence:   If anyone

13  should be fired, it should be you, Clarence,

14  because you stole from Lowe's, our valued customer.

15          Did Clarence tell you that Wally had said

16  that in his firing session?

17      A.   No.

18          MS. COGBILL:   Objection.   Assumes facts.

19      A.   No.

20      BY MR. FOX:

21      Q.   Now, are you aware that Clarence when          Assumes Facts
                                                            Foundation
22  confronted with the mistinting allegations by Ian

23  Dalton, that he lied about it?   He said he never

24  told anyone to mistint?

25          MS. COGBILL:   Objection.   Assumes facts.

Page 126

 1       A.   I wasn't part of that conversation.

 2       BY MR. FOX:

 3       Q.   Were you aware that Wally had been told

 4    that -- in his -- in his firing session that -- by

 5    Clarence that it doesn't matter what -- what he --

 6    what he had to say, that he was going to be fired

 7    anyways?

 8           MS. COGBILL:   Objection.   Assumes facts.

 9       A.   I wasn't a part of that conversation at

10    all, so I'm going to answer no to any question

11    related to this.

12       BY MR. FOX:

13       Q.   Did Andy Mayhew not call you up after the

14    session and talk to you at all about what Wally had

15    said?

16       A.   I don't believe so.

17       Q.   You don't recall if he called you and

18    said -- asked you about why Wally would have said

19    to Clarence:   You should be fired.   It should be

20    you because you stole from Lowe's, our valued

21    customer?

22           MS. COGBILL:   Objection.   Assumes facts.

23       A.   I don't -- I don't believe so.   No.   At

24    least I don't remember, so.

25       BY MR. FOX:

Page 127

Argumentative
Lay Opinion

```
 1      Q.  Do you think it's ironic that Clarence

 2   Moore is still at the company, still at PPG,

 3   employed, when Wally, who blew the whistle, was

 4   fired?

 5          MS. COGBILL:  Objection.  Assumes facts.

 6   Argumentative.

 7      A.  I don't have an opinion.  I'm not his

 8   supervisor and I didn't hire him, so I don't know.

 9      BY MR. FOX:

10      Q.  Can I ask you about Exhibit 46, just had a

11   question about this document.  It's a document

12   dated October 23rd, 2018.  This is an e-mail that

13   you forwarded to Andy Mayhew on October 23rd, 2018.

14   This was sent after Wally's termination, correct?

15      A.  I'm not sure exactly what day he was

16   terminated.  September 6th, so according to this

17   document, yes.

18      Q.  Okay.  Why did you send this?  Do you

19   know?

20      A.  Because Andy asked me for it.

21      Q.  Do you know why?

22      A.  No.

23      Q.  Just ask you to identify Exhibit 36.  It

24   appears to be a Non-Exempt Position Description for

25   the Lowe's territory managers.  Is that -- is that
```

1            UNITED STATES DISTRICT COURT

2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    WALLEN LAWSON,                    )
                                       )
5              Plaintiff,              )
                                       )
6         vs.                          )   Civil Action No.
                                       )   8:18-cv-00705-AG-JPR
7    PPG ARCHITECTURAL FINISHES,       )
     INC.,                             )
8                                      )
               Defendant.              )
9    _____)

10

11

12                                          no change

13                                          JVS  4.22.25

14

15       VIDEOTAPED DEPOSITION OF BEAU GOODWIN

16              IRVINE, CALIFORNIA

17         MONDAY, DECEMBER 10, 2018

18

19

20

21

22

23

24

25   DORIEN SAITO, CSR 12568, CLR

Page 24

```
 1              MR. BINDER:  Objection.  No foundation.
 2   Calls for speculation.
 3              MR. FOX:  I'm asking yes or no.  I don't
 4   know how it calls for speculation, Counselor --
 5              MR. BINDER:  Vague as to time.
 6              MS. LAVI:  Join.
 7   BY MR. FOX:
 8       Q.   At any time --
 9              SPEAKER3:  And I join in those objections.
10   BY MR. FOX:
11       Q.   At any time.  Let's --
12              MS. LAVI:  Please let me make objections as
13   well.
14              MR. FOX:  Okay.  You should object as to
15   form that's it.
16       Q.   Now, can you answer the question?
17       A.   The -- the answer is no.
18       Q.   Okay.  Were you aware that Clarence Moore
19   had asked his territory managers to mis-tint the
20   Rescue It product?  Did you ever hear of that
21   happening?
22              MR. BINDER:  Objection.  No foundation.
23   Calls for speculation.
24              MR. FOX:  The answer is whether he knew of
25   it.
```

Incomplete
Foundation
Calls for
Speculation
403

1          MS. LAVI:  Lacks personal knowledge and I

2     join in the objections as well.  Thank you.  And

3     assumes facts not in evidence.

4     BY MR. FOX:

5          Q.   Okay.

6          A.   No.

7          Q.   Okay.  Did you ever hear of anything like

8     that happening with any vendor representatives?

9               SPEAKER2:  Objection.  Vague and ambiguous

10    as to "like that."  No foundation.  Calls for

11    speculation.

12              MS. LAVI:  And it assumes facts not in

13    evidence, and I join in those objections as well.

14              THE WITNESS:  No.

15    BY MR. FOX:

16         Q.   Okay.  If you had heard that the PPG

17    regional manager was telling his territory managers

18    to mis-tint products that were being sold to Lowe's,

19    what -- what would your reaction have been?

20              MR. BINDER:  Objection.  Calls for

21    speculation.  No foundation.  It's an incomplete

22    hypothetical.  It's vague and ambiguous.  Calls for

23    a narrative.

24              MS. LAVI:  And assumes facts not in

25    evidence as well as those objections.

**NETWORK DEPOSITION SERVICES**
**Transcript of Andrew Mayhew**

1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2       FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                    - - -

 4    WALLEN LAWSON,              )
                                 )
 5              Plaintiff,        )
                                 )
 6         vs.                    )        Case No.
                                 )  8:18-cv-00705-AG-JPR
 7    PPG ARCHITECTURAL           )
      FINISHES, INC.,             )
 8              Defendant.        )
                                 )
 9
10                    - - -

11      Videotape Deposition of ANDREW MAYHEW

12         Thursday, March 21, 2019

13                    - - -

14        The videotape deposition of ANDREW MAYHEW,
      called as a witness by the Plaintiff, pursuant to
15    notice and the Federal Rules of Civil Procedure
      pertaining to the taking of depositions, taken
16    before me, the undersigned, Nina Warren Biehler, a
      Notary Public in and for the Commonwealth of
17    Pennsylvania, at the law offices of Obermayer
      Rebmann Maxwell & Hippel LLP, Suite 5240, One
18    Mellon Center, 500 Grant Street, Pittsburgh,
      Pennsylvania 15219, commencing at 10:16
19    o'clock a.m., the day and date above set forth.

20

21

22                    - - -                        NO Change

23         NETWORK DEPOSITION SERVICES
                 1101 GULF TOWER
24               707 GRANT STREET
           PITTSBURGH, PENNSYLVANIA  15219
25                 (866)565-1929
                      - - -
```

## NETWORK DEPOSITION SERVICES
### Transcript of Andrew Mayhew

35

1    you not?

2        A    Yes.

3        Q    And were you not aware, at the time

4    you signed off on it, that Clarence Moore had

5    directed his subordinates, including Wally Lawson,

6    to commit inventory fraud?

7        A    I'm not aware of that.  I'm only aware

8    of it based off of what I know from this lawsuit.

9        Q    Did no one advise you that Wally

10   Lawson had called the ethics hotline and reported

11   his supervisor's fraudulent activity?

12       A    I was not aware of that, no.

13       Q    When did you become aware of that?

14       A    When this lawsuit was brought forward.

15       Q    Okay.  Had you known that, had you

16   known that Wally had reported that Clarence Moore

17   had directed him to commit inventory fraud, would

18   you have handled this situation differently?

19            MR. SCHROEDER:  Objection, calls

20       for speculation.

21            But you can answer.

22            THE WITNESS:  I mean, it would

23       have depended on everything involved, what

24       was told to him, what -- what the severity

25       was.  I can't confirm.

Foundation
Calls for
Speculation

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Andrew Mayhew**

36

Foundation
Calls for
Speculation

1    BY MR. FOX:

2        Q    Do you think you would have allowed

3    Clarence Moore to terminate Wally had you known

4    that?

5        A    Again, depending on the severity.  I

6    mean, depending on all the cases -- depending on

7    all the facts in the case, I can't confirm what

8    our recommended course of action would have been.

9        Q    Is it a violation of the Global Code

10   of Ethics for a manager or supervisor to instruct

11   a subordinate, who's a nonexempt employee, to work

12   hours off the clock without reporting them?

13       A    I'm not -- I'm not sure if it's within

14   our Global Code of Ethics, but it's against our

15   time and attendance policy to work hours off the

16   clock.

17       Q    Okay.  And why is this important?

18       A    To ensure that we pay employees for

19   all hours they worked.

20       Q    And because it's not fair to the

21   employee to make them work hours -- extra hours

22   without being paid; isn't that right?

23       A    Yes.

24       Q    I'd like you to take a look at Moore

25   Exhibit 24.

**NETWORK DEPOSITION SERVICES**
**Transcript of Andrew Mayhew**

56

Argumentative
Assumes Facts

1      Q      Okay.  So if someone testified under

2   oath that there was, they'd be lying?

3                  MR. SCHROEDER:  Objection,

4      assumes facts.

5                  THE WITNESS:  I -- I mean -- I

6      was not aware of a formal policy.

7   BY MR. FOX:

Argumentative
Assumes Facts

8      Q      Okay.  If Clarence Moore had said that

9   in his deposition the day before yesterday, he

10  would be lying, correct?

11                 MR. SCHROEDER:  Objection,

12     assumes facts, calls for speculation.

13                 THE WITNESS:  I was not present.

14  BY MR. FOX:

Argumentative
Assumes Facts

15     Q      Okay, I'll represent to you that's

16  what he said.

17     A      Okay.

18     Q      So that would be a false testimony,

19  correct?

20     A      Yes.

21     Q      Okay.  How frequently do regional

22  managers typically do market walks with territory

23  managers?

24     A      I don't recall what the quota was, but

25  I know each manager had a set expectation that

**NETWORK DEPOSITION SERVICES**
**Transcript of Andrew Mayhew**

70

```
 1      A      From what I understand of the market
 2   walk, it was, for each task or each topic, you
 3   either received all the points or none.  It was an
 4   all or nothing scaling.
 5      Q      What -- what is your basis for that
 6   belief?
 7      A      Just in having conversations with the
 8   business in how the form was completed.
 9      Q      Okay, other than -- other than with
10   respect to Wally's performance improvement plan,
11   did you ever have cause to evaluate any other
12   market walk reports during your HR career, up to
13   this point in time?
14      A      If other employees were not
15   performing, sure, we reviewed their market walks.
16      Q      Do you recall any?
17      A      Not specifically.
18             MR. FOX:  Okay, I'd like to show
19         you what's been marked as Plaintiff's Exhibit
20         No. 43.
21             By the way, let the record
22         reflect that Andrew Horowitz has replaced
23         Qiwei Chen in attending the deposition.
24   BY MR. FOX:
25      Q      Have you seen Exhibit 43 before?
```

Foundation
Relevance
403
Lay Opinion

**NETWORK DEPOSITION SERVICES**
**Transcript of Andrew Mayhew**

71

Foundation
Relevance
403
Lay Opinion

```
 1      A     I -- I would have been sent this
 2  e-mail, yes.
 3      Q     Okay.  Do you recall -- so this an
 4  e-mail you received from Clarence Moore, correct?
 5              MR. SCHROEDER:  Objection.
 6              THE WITNESS:  From Sean.
 7  BY MR. FOX:
 8      Q     Well, it was forwarded to you from
 9  Sean, correct?
10      A     I see that it's from Sean.
11      Q     Okay.  And does it contain an e-mail
12  from Clarence Moore?
13      A     Yes.  It was from Clarence, to Wally.
14      Q     Okay.  In the first page, does the
15  e-mail from Clarence Moore contain his tag line?
16      A     Yes.
17      Q     And can you read to me his tag line?
18      A     "Being committed is so much more
19  rewarding than being compliant."
20      Q     What did you take his tag line to
21  mean?
22      A     I -- I'm not sure.
23      Q     Did anyone in the company have an
24  adverse reaction to his tag line?
25              MR. SCHROEDER:  Objection,
```

Foundation
Relevance
403
Lay Opinion

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Andrew Mayhew**

72

```
 1      foundation.
 2                  THE WITNESS:  Not that I'm aware
 3      of.
 4  BY MR. FOX:
 5      Q    Did you?
 6      A    No.
 7      Q    Well, you were in charge of
 8  compliance, that was one of your primary roles in
 9  HR; was it not?
10                  MR. SCHROEDER:  Objection,
11      mischaracterizes his testimony.
12                  THE WITNESS:  It would have been
13      a function, yes.
14  BY MR. FOX:
15      Q    So were you not concerned that
16  Clarence appeared to be pooh-poohing compliance in
17  his tag line?
18      A    I mean, employees put tag lines in
19  their e-mails, multiple employees do that.
20           No, I don't think he would -- he meant
21  it in the fact where he was trying to be
22  noncompliant with company policy or procedures.
23      Q    Okay.  Do you think this, in
24  retrospect, this e-mail tag line that Clarence had
25  adopted was revealing of who he was as a manager?
```

Foundation
Relevance
403
Lay Opinion

Foundation
Relevance
403
Lay Opinion

**NETWORK DEPOSITION SERVICES**
**Transcript of Andrew Mayhew**

73

```
 1              MR. SCHROEDER:  Objection, calls
 2        for speculation.
 3              THE WITNESS:  No.
 4        BY MR. FOX:
 5        Q     This is a manager who would defraud
 6        the company's partner, Lowe's, systematically
 7        through inventory fraud; isn't that right?
 8              MR. SCHROEDER:  Objection,
 9        argumentative, assumes facts.
10              THE WITNESS:  Again, I don't have
11        all the facts of that investigation, so I'm
12        not -- I mean, I'm not sure if that's what
13        his -- if he was malicious in that with his
14        intent to do that.
15        BY MR. FOX:
16        Q     Do you think he was, maybe, reckless
17        in his intent, if he wasn't malicious?
18              MR. SCHROEDER:  Objection,
19        assumes facts, foundation, calls for
20        speculation.
21              THE WITNESS:  Again, I don't have
22        all the facts of the case.  And, again,
23        there's multiple things to be considered for
24        me to make that determination.
25
```

Foundation
Relevance
403
Lay Opinion

Foundation
Relevance
403
Lay Opinion

**NETWORK DEPOSITION SERVICES**
**Transcript of Andrew Mayhew**

74

BY MR. FOX:

Foundation
Relevance
403
Lay Opinion

1    BY MR. FOX:

2        Q    Well, look, you're still in -- you're

3    still in HR at the company, correct?

4        A    Yes.

5        Q    Does it not concern you that Clarence

6    Moore is at the company, gainfully employed, and

7    had conducted an operation that resulted in the

8    defrauding of PPG's former partner Lowe's?

9            MR. SCHROEDER:  Objection, it

10           assumes facts, it's argumentative, it's been

11           asked and answered.

12           THE WITNESS:  Again, I was not

13           involved in the investigation, so -- I mean,

14           there's multiple things to be considered.  I

15           mean, Clarence, yes, is still employed.

16           MR. FOX:  Um-hum.

17           THE WITNESS:  So, I mean, based

18           off of the documents you showed he was issued

19           a warning, so.  He -- yes, he's still an

20           employee.

21   BY MR. FOX:

22       Q    Okay.  Does that -- does that concern

23   you in any way?

24       A    No.

25       Q    Do you know if Lowe's was ever

Foundation
Relevance
403
Lay Opinion

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Andrew Mayhew**

75

Foundation
Relevance
403
Lay Opinion

```
 1    informed of the inventory fraud that was

 2    orchestrated by Clarence Moore?

 3        A    I'm not sure.  I mean, that wasn't one

 4    of my roles in HR.

 5        Q    Would it concern you to hear that

 6    Lowe's had never been informed of the inventory

 7    fraud?

 8                MR. SCHROEDER:  Objection,

 9        assumes facts.

10                And, just again, for the record,

11        there's a motion for a protective order

12        pending on this issue.

13                I mean, as with Moore's

14        deposition, I'll allow him to answer the

15        question as long as we agree that it's not a

16        waiver of any of the arguments in the motion

17        for a protective order.

18                MR. FOX:  I agree it's not a

19        waiver.

20                MR. SCHROEDER:  Okay, you can

21        answer if you know.

22                THE WITNESS:  Can you repeat the

23        question?

24                MR. FOX:  Yeah, can we read it

25        back, please.
```

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg - Scranton**
**866-565-1929**