**F I L E D**
CLERK, U.S. DISTRICT COURT
4/23/25
CENTRAL DISTRICT OF CALIFORNIA
BY: _____eva_____ DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Wallen Lawson, | 8:18-cv-00705- JVS(JPRx) |
| vs. | COURT'S RULINGS ON DEPOSITION DESIGNATIONS |
| PPG Industries, Inc. | |

1

1  160 W Santa Clara St.
   Suite 400
2  San Jose, CA 95113
   Telephone: 408.579.0404
3
   *Attorneys for Defendant*
4  PPG ARCHITECTURAL FINISHES, INC.

Reviewed 4.23.25
S = sustained
O/R = overruled
JVS

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALLEN LAWSON, | Case No. 8:18-CV-00705-AG-JPR |
| Plaintiff, | **JOINT DEPOSITION DESIGNATIONS FOR JOHN DALTON** |
| v. | Pretrial Conference: April 7, 2025 |
| PPG ARCHITECTURAL FINISHES, INC., | Trial: April 22, 2025 |
| Defendant. | |

Pursuant to C.D. Cal. Local Rule 16-2.7(a)-(c), Plaintiff, Wallen Lawson ("Plaintiff") and Defendant, PPG Architectural Finishes, Inc. ("Defendant") jointly submit the following deposition designations and objections. The designations and objections are being submitted after the original deadline due to a change in circumstances—specifically, John Dalton who was initially expected to testify in person will no longer be appearing live at trial. Plaintiff's designations are in green bracketing, and Defendant's designations are in blue bracketing throughout Appendix A, attached hereto.

### John Dalton (*see* Appendix A attached)

| **Plaintiff's Designations** | **Defendant's Grounds for Objections** |
|---|---|
| 4:25 | |

Case 8:18-cv-00705-JVS-JPR    Document 166    Filed 04/21/25    Page 3 of 7    Page ID #:3225

| Plaintiff's Designations | Defendant's Grounds for Objections |
|---|---|
| 5:2-5 | Relevance    5 |
| 9:13-21 | |
| 10:6-9 | |
| 10:19-22 | |
| 11:30-10 | |
| 12:10-13:12 | |
| 15:15-16:5 | |
| 16:12-19 | |
| 18:16-19:2 | |
| 19:12-20:8 | |
| 20:9-17 | Foundation. Speculation.    5 |
| 21:10-22:23 | |
| 23:11-18 | |
| 23:25-24:17 | |
| 25:3-25 | |
| 26:21-30:20 | |
| 31:6-17 | |
| 32:18-33:25 | |
| 34:8-35:11 | |
| 35:25-36:17 | |
| 37:8-18 | |
| 39:7-16 | Foundation. Assumes Facts.    5 |

| Plaintiff's Designations | Defendant's Grounds for Objections | |
|---|---|---|
| 93:3-13 | Foundation. Speculation (Dalton not on the email) | O/R |
| 95:20-25 | Foundation. Relevance. | S |
| 96:7-22 | Foundation. Relevance. | O/R |
| 98:4-13 | Foundation. Speculation. | S |
| 98:14-99:20 | Foundation. Speculation. | S |
| 101:3-13 | Foundation. Speculation. Relevance | O/R |
| 102:10-14 | | |
| 102:23-103:3 | Foundation. Speculation. | O/R |
| 103:4-8 | Foundation. Speculation. | O/R |

| Defendant's Designations | Plaintiff's Grounds for Objections |
|---|---|
| 4:19-5:1 | |
| 5:13-18 | |
| 9:13-21 | |
| 10:6-11:7 | |
| 12:14-13:12 | |
| 16:12-19 | |
| 18:16-20:8 | |
| 20:18-25 | |
| 21:22-24:20 | |
| 25:3-26:8 | |
| 26:21-33:2 | |

5

```
                                                                Page 1
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4    -------------------------------x

 5    WALLEN LAWSON,                  :

 6                Plaintiff,          : Civil Action No.

 7         vs.                        : 8:18-cv-00705-AG-JPR

 8    PPG ARCHITECTURAL FINISHES,     :

 9    INC.,                           :

10                Defendants.         :

11    -------------------------------x

12                    TRANSCRIPTION OF

13        VIDEOTAPED DEPOSITION OF VINCENT WILCHER

14                    April 11, 2019

15                     10:09 a.m.

16              201 Third Street, Northwest

17                     Suite 1630

18               Albuquerque, New Mexico

19

20

21

22

23    Job No. 224599

24    Pages 1 - 59

25    Transcribed: Mary A. Seal, RDR, CRR, NM CCR 69
```

Handwritten annotations: "JVS 4.23.25", "JVS No Charge", "— = Reinstated"

```
 1    certain amount of time to do your administrative
 2    work?
 3         A    I was, yes.
 4         Q    What did your administrative work consist
 5    of?
 6         A    Basically it was inputting my -- we had to
 7    confirm our hours through the portal, through the
 8    PPG portal, so it consisted of confirming those
 9    hours.  If we had any online training courses to do,
10    I would get those done.  If I had rosters and
11    different clerical tasks to take care of, such as
12    training roster, such as, like, my -- we had these
13    forms where we would have to fill in sales numbers
14    and it would track, you know, gallons at each store.
15    I would take time to fill in those reports to track
16    and see what store -- where stores were at.
17         Q    Uh-huh.
18         A    Mainly that.
19         Q    Okay.  Did -- how much time did you
20    have -- how much time was allotted for you to do
21    your administrative work?
22         A    We were allotted five hours per week, but
23    if we consistently put five hours on our timesheets,
24    then we would basically be told, you know, "You
25    really shouldn't be using all five hours every week.
```

[handwritten margin note: "Reeves depo" / bracket around lines 19-25]

Page 29

```
 1   It should only take you two to three hours."
 2        Q    Okay.  And, in fact, how much -- how much
 3   time did it take for you to do your administrative
 4   work, on average?
 5        A    Some weeks, up to ten hours to really
 6   knock out all the different rosters and different
 7   reports.
 8        Q    Okay.  Did you -- did you submit those ten
 9   hours or more than five hours when you would incur
10   that additional time?
11        A    I didn't, no.
12        Q    And was that because of the direction
13   given to you by Mr. Kacsir --
14        A    Correct.
15             MR. MANOUKIAN:  Objection, form.
16        A    Yes.
17        Q    -- that you referred to earlier?
18        A    Correct.  Yes.
19        Q    And did Clarence Moore ever give you
20   similar instructions?
21        A    Yes.  He made it very clear that "You
22   don't want to consistently use five hours per week
23   for your admin time.  It really only should be one,
24   two, maybe three hours each week."
25        Q    Okay.  Did he tell you what the
```

1  consequences would be if you didn't follow that
2  direction?
3      A    It was never made clear what the
4  consequences would be.  But it was -- it was clear
5  that you weren't supposed to do it, supposed to have
6  those five hours each week on there.
7      Q    Okay.  Did Clarence Moore also give you
8  direction as to whether or not you could submit
9  overtime for more than -- working 45 hours per week?
10     A    It was clear that it was only 45 hours per
11 week, that it would get submitted, that that was --
12 that's all that was allowed.
13     Q    Okay.  And how did he make that clear?
14     A    I don't remember if he said something in
15 the call or -- I think if -- a couple times I tried
16 submitting, you know, 46, 47 hours because I was
17 covering a store that was three hours away and we
18 would get compensated for some drive time.  But he
19 would say, you know, "You're only supposed to be
20 working 45 hours per week."
21     Q    Uh-huh.
22     A    You know, if -- I forget exactly what he
23 said, but I remember, yeah, being told, like, yeah,
24 it really only should be 45 hours per week for the
25 job.

Page 54

```
 1             MR. MANOUKIAN:  Object to form.
 2        Q    And how was -- when you say he was
 3   aggressive, how did he -- how did he manifest that?
 4        A    Again, a lot of the -- you know, pulling
 5   product down from the top storage areas and just
 6   building stackouts without getting approval, and
 7   really, you know, just going about the store like it
 8   was our store, and not getting any approval
 9   anywhere.
10        Q    Okay.  Did Sean Kacsir engage in those
11   practices also?
12        A    Yes.
13             MR. MANOUKIAN:  Objection to form.
14        Q    Okay.  And when did -- when did Sean
15   Kacsir do that?  Was that when you were with him in
16   the store?
17        A    Correct, yeah.  When he was my boss and
18   we'd do market walks, he would build stackouts
19   without approval.  There was one time we had, like,
20   a big store training and he came down when Clarence
21   was our boss and Sean just pulled a bunch of product
22   down from a top stack and just built a stackout in
23   the middle of the store without any approval.
24        Q    And what was your reaction to that?
25        A    I thought it was kind of -- it wasn't --
```

```
 1   for lack of a better word, it was pretty crappy of
 2   him, because it's a store that he'd never been in,
 3   and you know, the store he has no relationships in,
 4   and to, like, put something out there when, you
 5   know, it's clear that, you know, they didn't -- the
 6   store didn't want product in that location, he just
 7   decided to build it out right there.
 8        Q    Okay.  Did Sean Kacsir ever instruct you
 9   not to mis-tint the paint?
10        A    Not that I recall, no.
11        Q    Was he aggressive in other ways you can
12   think of?
13        A    Yeah.  I mean, we would -- like I said,
14   with the stackouts.  But also we would change the
15   planograms a little bit here and there to where we'd
16   get more facings for our products and move labels
17   and we'd just adjust the planograms so we had more
18   product facing out than the competitor.
19        Q    Okay.  Explain what you mean by the
20   planograms.
21        A    So in Lowe's, they have -- each store has
22   their own set, and it's -- I don't know if it comes
23   from Lowe's corporate or how it all works, but
24   basically Lowe's says, you know, "These are your
25   spots on the shelf," you know.  It's drawn out on a
```

1  piece of paper to show exactly where our product is
2  supposed to be, where, you know, the competitor's
3  product or whatever is supposed to be.  But him and
4  Clarence both regularly, you know, just moved
5  product from, like, a single facing of our product
6  to, like, expand it to double- or triple-facing to
7  get more visibility on the shelf.
8      Q    Okay.  Why was that improper?
9      A    Because Lowe's -- I mean, like I said
10 before, it's their store, it's their setup, you
11 know.  It was clear in paper, say, like, this is
12 what Lowe's says is how it's supposed to be set, and
13 they would just go about and do it.
14     Q    Okay.  Do you recall any other
15 unprofessional conduct by Sean Kacsir?
16          MR. MANOUKIAN:  Objection, form.
17     A    Not that I recall, no.
18          MR. FOX:  Okay.  Thank you.  Those are all
19 the questions I have.
20          THE WITNESS:  Cool.
21                 FURTHER EXAMINATION
22 BY MR. MANOUKIAN:
23     Q    With respect to -- let me back up.  Strike
24 that.  You have no knowledge of any conversations
25 that either Clarence Moore or Sean had with any